UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

\- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 19cr286(AMD)

Plaintiff,

-against- : United States Courthouse
: Brooklyn, New York

ROBERT SYLVESTER KELLY,

Defendant. : Thursday, July 15, 2021
: 1:00 p.m.

\- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR CURCIO HEARING
BEFORE THE HONORABLE ANN M. DONNELLY
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government: JACQUELYN KASULIS, ESQ.
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
BY: MARIA CRUZ MELENDEZ, ESQ.
NADIA SHIHATA, ESQ.
Assistant United States Attorneys

For the Defendant: AIELLO & CANNICK
69-06 Grand Avenue
Maspeth, NY
BY: DEVEREAUX LEON CANNICK, ESQ.

For the Defendant: THE LAW OFFICE OF THOMAS A. FARINELLA
260 Madison Avenue, 8th Floor
New York, NY 10016
BY: THOMAS A. FARINELLA, ESQ.

COURT REPORTER: SOPHIE NOLAN, RPR, OCR
E-mail: NolanEDNY@aol.com

BLANK LAW, PC
444 S. Washington Ave.
Royal Oak, MI 48067
BY:NICOLE BLANK BECKER, ESQ.

GREENBERG TRIAL LAWYERS
53 West Jackson, Suite 1260
Chicago, IL 60604-6060
BY:STEVEN A GREENBERG, ESQ.
(Via teleconference.)

LEONARD MEYER LLP
120 N. LaSalle, Ste 20th Floor
Chicago, IL 60602
BY:MICHAEL LEONARD, ESQ.
(Via teleconference.)

Curcio counsel: MEISTER SEELIG & FEIN LLP
125 Park Ave, 8th Floor
New York, NY 10017
BY:ILANA HARAMATI, ESQ.

(In open court.)

(The Hon. Ann M. Donnelly, presiding.)

(Defendant present.)

THE COURTROOM DEPUTY: This is criminal cause for a Curcio hearing, docket number 19-CR-286, *USA versus Robert Kelly*.

Counsel state your appearance, Government first.

MS. MELENDEZ: Good afternoon, Your Honor. Maria Cruz Melendez and Nadia Shihata.

MS. BLANK BECKER: Nichole Blank Becker on behalf of Mr. Kelly seated to my left and seated to my right is attorney Devereux Cannick and to my far left is attorney Tom Farinella. Thank you, Judge.

THE COURT: Good afternoon.

MS. HARAMATI: Ilana Haramati, Curcio counsel.

THE COURT: Good afternoon.

MR. GREENBERG: Steve Greenberg and Mike Leonard on the phone.

THE COURT: Thanks. And I think we have Ms. Rodriguez also; is that correct?

MS. RODRIGUEZ: Yes, Your Honor, I am present in your virtual courtroom.

THE COURT: Okay. I just want to be sure everybody can hear. Just a quick outline of what we're going to do today. Parenthetically, I did get Mr. Cannick's letter which

I will address at the end of today's proceeding.

This is a continuation of the Curcio hearing that we began I believe on the 17th. This is hearing is taking place pursuant to the Court's obligation to investigate whenever, quote, the spectre of attorney conflicts of interest arise.

In connection with today's proceeding, I have reviewed all of the submissions that I have gotten, not just since -- before June 17th, but also those that were submitted after that hearing. I am just going to remind everyone that I am not here to mediate disputes among the lawyers. I am not interested in anything that does not relate to the discrete issues of the extent to which it is -- and I think it's only Ms. Becker at this point who may have a conflict.

I don't care when Mr. Greenberg met Ms. Rodriguez. I have no interest in anything to do with that. I am only interested in the extent to which there is a conflict because Mr. Kelly has a right to have conflict-free representation and if he's going to waive it, he is entitled to know what the conflict is and have it explained to him.

As I said before, I appointed Ms. Haramati as Curcio counsel and I thank her for her efforts in this regard to advise Mr. Kelly about any potential conflicts and we will talk about that in a bit.

Included in the submissions that I received were an e-mail and some other materials from Ms. Rodriguez about this

possible conflict of interest relating to the two witnesses. I am going to remind counsel there is one witness that we are referring to as Jane Doe No. 5. Do not use her name. She is to be referred to as Jane Doe No. 5, but I do have some questions for Ms. Rodriguez regarding some of the materials that she submitted.

Some of the those questions will, in all likelihood, implicate the attorney/client privilege, her representation of these two witnesses, and for those portions that do involve her attorney/client relationship with Jane Doe No. 5 and the other witness, I will have a conversation with her ex parte.

Some of the inquiry that I have of Ms. Rodriguez I think we can do in open court, but I am going to ask Ms. Rodriguez to let me know the extent to which anything that I am asking or that she wants to discuss implicates that privilege. And I also want to make sure --

Ms. Rodriguez, you haven't been here before, but we are referring to one of your clients as Jane Doe No. 5; okay?

MS. RODRIGUEZ: Yes, Your Honor.

THE COURT: And then I think we are referring to the other witness by her name, Ms. Savage; is that correct?

MS. MELENDEZ: That's correct.

THE COURT: Is there anybody else that is to be referred to as a Jane Doe?

MS. MELENDEZ: For the purposes of this discussion I

believe that's it, Your Honor.

THE COURT: Okay. Ms. Rodriguez, I'm going to ask you some of the questions that we can talk about in open court and if these relate to subjects that will involve discussions about privileged communication, let me know, okay?

MS. RODRIGUEZ: Okay.

THE COURT: When were you retained by Jane Doe No. 5 and Joycelyn Savage?

MS. RODRIGUEZ: I was retained by them in July of 2019.

THE COURT: And for how long?

MS. RODRIGUEZ: And the exact date -- I'm sorry. I was looking for the exact date, but it was very early July 2019.

THE COURT: Okay. And for how long did you represent them?

MS. RODRIGUEZ: I represented them jointly until about September 1 of 2019.

THE COURT: When did you first come into contact with Ms. Becker?

MS. RODRIGUEZ: I first met Ms. Becker in person at the bond hearing that was at the Dirksen Center in July 2019.

THE COURT: At the what center?

MS. RODRIGUEZ: The Federal Building in Chicago. It's called the Dirksen building.

THE COURT: Dirksen, okay. And was that in connection with your representation of these two women?

MS. RODRIGUEZ: It was because -- yes, I would say yes.

THE COURT: And at the point that you met Ms. Becker, were you representing Jane Doe No. 5 and Ms. Savage the first time you met her?

MS. RODRIGUEZ: Yes.

THE COURT: Did you ever give Ms. Becker any instructions regarding her interactions with those witnesses?

MS. RODRIGUEZ: Yes.

THE COURT: And what were your instructions?

MS. RODRIGUEZ: I had asked her to please not contact my clients without my knowledge.

THE COURT: And what form --

MS. RODRIGUEZ: And I also --

THE COURT: Go ahead. I am sorry.

MS. RODRIGUEZ: I'm sorry. I know there is a delay so I am trying to speak slowly so you can all hear me.

THE COURT: That's fine. That's fine.

MS. RODRIGUEZ: The second one was to please not give them any advice about things that might pertain to the case or their interests.

THE COURT: And in what form did those -- what form did those instructions take?

MS. RODRIGUEZ: The form was through text message and through e-mail and through in-person.

THE COURT: And do you know approximately when you gave these various instructions?

MS. RODRIGUEZ: Yes -- and actually on the phone. I spoke to her on the phone. So, on July 15th, I sent her a text message with my e-mail address and called her and we had a very lovely conversation. And I communicated to her.

THE COURT: What did you say?

MS. RODRIGUEZ: I said specifically I don't want the lines to be blurred regarding our roles and I think they are already blurred. If you could please not contact them at all without my knowledge.

THE COURT: Did you text it to -- sorry. Let me finish the question. I know we have a little bit of a delay. Did you text that? Did you e-mail it? Did you say it in person? Did you do all three of those things?

MS. RODRIGUEZ: Yes. The text message was sent on July 15, 2019 at 5:15 p.m. Then the phone call with Ms. Becker was later that day and we spoke for about 45 minutes. Then I saw her on July 16th in person. I met her about 1:00 right before the hearing and we discussed it and it was very pleasant. She seemed to have understood what I was asking her to do.

THE COURT: You said she seemed to understand when

you met in person. Did you receive any response to the text message that you sent on July 15th?

MS. RODRIGUEZ: No.

THE COURT: And is there a way to tell when you send a text message whether or not the person has received it?

MS. RODRIGUEZ: Not through the technology that I had at the time.

THE COURT: For example, would your phone tell you if a message did not go through?

MS. RODRIGUEZ: No, it wouldn't, but I saved the text message on my device which I still have and I have it in my hand.

THE COURT: Okay. I think it may be included in some of the materials that I received. And so you still have it on the phone; is that correct?

MS. RODRIGUEZ: Yes.

THE COURT: So sometimes when people send text messages and it doesn't go through, you get an alert that tells you that it didn't go through. Does your phone do that?

MS. RODRIGUEZ: Yes, it does.

THE COURT: Did it do it at the time that you sent these text messages in -- is it 2019?

MS. RODRIGUEZ: Correct, 2019. It did not -- I'm sure she received it because we spoke after that text message.

THE COURT: What specifically did she said that led

you to the conclusion that she got the text message?

MS. RODRIGUEZ: On the phone I remember her saying, Gloria, I'm glad they retained you. I'm glad they retained an attorney. I'm Mr. Kelly's attorney, whatever you need -- the lines are drawn and I'm not going to step on your toes and she made it known that there was a clear understanding of my concern.

THE COURT: So this was July 16th --

MS. RODRIGUEZ: July 15th, the phone call, and the text was July 15th.

THE COURT: And you met her in person on the 16th when you had this conversation; correct?

MS. RODRIGUEZ: Correct. I actually met her and Mr. Greenberg in person for the first time July 16th.

THE COURT: Following those contacts on the 15th and the 16th -- did you also say that you sent an e-mail?

MS. RODRIGUEZ: In my notes I saw that I put an e-mail there, but I don't think that my office maintained a record of that. So I don't independently remember sending an e-mail. I had a little note here that said I sent an e-mail, but I don't actually have the e-mail.

THE COURT: Okay. Now, following these conversations, did you learn at some point that Ms. Becker was contacting either or both of these women without letting you know?

MS. RODRIGUEZ: Yes.

THE COURT: How did that happen?

MS. RODRIGUEZ: Well, Jane Doe No. 5 was kind of the point of contact for Ms. Savage and it was obvious to me that despite the lovely conversation that I had with Ms. Becker that Ms. Becker was still relaying to them information about Mr. Kelly's case and giving them what I believed was legal information, which was contradictory to what I was advising them on.

THE COURT: All right. Go ahead, sorry.

MS. RODRIGUEZ: And I can give you -- sure. Specifically there was an issue about what to do with the media and I remember asking them where are you coming with this and their reply was, Ms. Becker said, and then -- I was -- I have no doubt in my mind that Ms. Becker was continuing to speak to my clients, number one, without my knowledge; and, number two, relaying information that was of a material nature in response to their legal interests.

THE COURT: Now, I want to find out what the specifics of that information was, but I am -- it sounds to me like it would require you to divulge conversations that you had with your clients that are privileged. Is there anything you can tell us --

MS. RODRIGUEZ: That's correct, Your Honor.

THE COURT: Is there anything you can tell us about

that that is not privileged? If you can't, that's fine. We can --

MS. RODRIGUEZ: Yes. The -- the breakdown of my relationship with both of my clients, I believe, was led -- or I believe was encouraged by them still receiving information that was contrary to my advice for them and when I formally severed the relationship, I received instruction in a letter from my clients, signed by both of them, seeking to turn my file over to their new attorney. The new attorney was not named in the letter, but when I spoke to Jane Doe No. 5 and asked her where she wanted me to send it to, she gave me Ms. Becker's contact information. And then I had a discussion with her about that and how I felt that it was concerning to me that she would be representing them.

THE COURT: Is there anything else that you can tell us. You put quite a bit of information into your submissions.

Is there anything else that you can tell us that's not privileged that's relevant to this inquiry?

MS. RODRIGUEZ: I believe that would be it as far as what is not privileged.

THE COURT: I think that at this point we will recess so that the Court can do an inquiry ex parte on the topics that have to do with the attorney/client privilege. I don't think that will take all that long, but I am going to leave the courtroom to do that and we will be in recess until

we are finished with that.

(Pause in proceedings.)

THE COURT: Ms. Rodriguez, can you hear us?

MS. RODRIGUEZ: Yes, Your Honor, I can.

THE COURT: I spoke with Ms. Rodriguez about the communications that implicated the attorney/client privilege. There was one item or one incident that the witness described that I think is appropriate. It does not implicate the attorney/client privilege.

So I am just going to ask the witness to describe the conversation -- prior to the Court speaking with the witness ex parte, the witness described a conversation that she had with Ms. Becker on the 16th of July. I think that was the date. Following that conversation the witness, during the ex parte part of the inquiry --

You talked about a conversation that you had with Mr. Greenberg regarding your concerns about Ms. Becker. Can you describe that conversation?

MS. RODRIGUEZ: Yes, Your Honor. About a couple of weeks after the federal bond hearing in Mr. Kelly's case in Chicago, I had spoken with Mr. Greenberg about a different issue on the phone and it was a very brief conversation that I'm sure Mr. Greenberg may not remember, but in the conversation towards the end of this conversation I had mentioned to him if he could please talk to Ms. Becker to,

quote, rein her in. And the response that Mr. Greenberg said -- it was something to the effect of, good luck with that.

THE COURT: When you say "rein her in," I just want to be sure -- what do you mean; rein her in regarding what?

MS. RODRIGUEZ: Rein her in in respect to not communicating with my clients without my knowledge.

THE COURT: Okay?

MS. RODRIGUEZ: It was apparent to me that Ms. Becker continued speaking with them regularly and that my communications with Ms. Becker to please stop went unheeded. So I took my concern to Mr. Greenberg since I knew at the time Ms. Becker was on Mr. Kelly's legal team to ask him to please rein her in from continuing that behavior and he had said something to the effect of good luck with that.

THE COURT: Okay. I don't have any further questions for the witness.

Let me start with the Government, are there any additional questions that you want to put to the witness or you want me to put to the witness to complete the record on this issue?

MS. CRUZ MELENDEZ: No, Your Honor.

THE COURT: And how about from Mr. Kelly's side; any questions to put to the witness regarding the issues that I am interested in? I will put the question, but you tell me what

the question is.

MS. BLANK BECKER: I actually just have things that I would like to address to the Court. They're not specific questions to Ms. Rodriguez. Thank you.

THE COURT: All right, I think it's probably okay -- is it okay to let the witness go?

MS. CRUZ MELENDEZ: The Government has no objection to that.

THE COURT: All right. I want to be sure that Curcio counsel -- is there anything that you need to hear from her?

MS. HARAMATI: No, Your Honor.

THE COURT: And nothing else from Mr. Kelly's side that we need to put to the witness?

MS. BLANK BECKER: No, Judge. Thank you.

THE COURT: Thank you very much, Ms. Rodriguez. You are free to go?

MS. RODRIGUEZ: Great. Thank you, Your Honor.

THE COURT: Okay. Now I will hear from the parties. If there's anything additional, any additional things they want me to look at, anything else that they want me to say.

I don't know, Ms. Becker, if in the time since that conference in June you have had a chance to refresh your recollection about the matters at issue in this hearing or if there's anything that you want to say, bearing in mind that

the focus of the hearing is Mr. Kelly's right to conflict-free counsel.

As difficult as these inquiries are, it's not about, unless it's a factual question about -- it's not about you, in other words. It's about whether there is a conflict and I will repeat; it's also not about whatever disputes and disagreements that you have with Mr. Leonard and Mr. Greenberg.

Keeping that in mind, is there something specific that you have to add?

MS. BLANK BECKER: Thank you, Judge. Judge and I don't mean to belabor the point, but I think it's appropriate for me to make a record as well and just forward my thoughts.

Judge, I did have a chance to look at the messages that were sent on the piece of paper that was given to us from Ms. Rodriguez. Obviously it does show that she attempted and/or did, apparently -- she can't even tell us --

THE COURT: Did you get it?

MS. BLANK BECKER: Yes, yes.

THE COURT: But did you get it when it was sent? That's the question.

MS. BLANK BECKER: Judge, unfortunately I have zero recollection of seeing it. It doesn't mean I didn't get it. It just means I have zero recollection of seeing this.

THE COURT: Okay.

MS. BLANK BECKER: Thank you. Additionally, Judge, what I provided for the Court since I had an opportunity to now review the materials that I had specifically pertaining to Ms. Rodriguez and/or my communications with the girls --

THE COURT: The women.

MS. BLANK BECKER: I'm sorry.

THE COURT: They are women. They are adult women.

MS. BLANK BECKER: The women. You are correct, Judge. I apologize. Judge, my -- my research based on the text messages that I was able to look through, Judge, and I supplied this to the Court, simply show that on July 13th, Jane Doe No. 5 sent me a text message indicating that she hired a spokesperson and that spokesperson was Ms. Gloria Rodriguez. So I was made aware of that on the 13th.

And then on that particular day I also had some conversations -- text message conversations with Mr. Greenberg and when I had conversations with Mr. Greenberg, he was asking me if I would ask the girls if they were coming to court that day.

THE COURT: I am just going to stop you.

MS. BLANK BECKER: Sorry.

THE COURT: I am -- it is 2021. We are talking about women in their 20s. They are not girls. Please do not refer to them that way.

MS. BLANK BECKER: I apologize, Judge. It's been

two years.

THE COURT: They were women then, too. Go ahead.

MS. BLANK BECKER: The discussion was about the woman and in that text message he had wanted me to contact them and specifically I indicated to Mr. Greenberg, and this is in the text message: They said they are having Gloria Schmidt be their spokesperson. Apparently she told them she had lunch with you the other day, so this would have been prior to July 13th. I am sure they would like to come to the hearing. Do you think they should, and what time. And his response, Judge, was: People talk too much. We had a meeting in a secret location so nobody would know.

THE COURT: What does this have to do with your communications with these two represented witnesses?

MS. BLANK BECKER: It does, Judge, because if I could finish that sentence --

THE COURT: I read it. You submitted it so there's no reason to keep reading it.

MS. BLANK BECKER: Just for the record.

THE COURT: It's on the record.

MS. BLANK BECKER: So, Judge, Mr. Greenberg told me that she couldn't represent the women. Okay. So although I knew on my own from conversations with Ms. Rodriguez that she was going to represent them --

THE COURT: But that is -- I am sorry to sound

impatient, but the question is whether you knew and you said the last time that you did know that she represented them. So that's why I am not really interested --

Mr. Greenberg wants to get off the case. If he were on the case I would ask him these questions, but my intention is to excuse them. So that's why I am not really -- that is why I am trying to explain it to you. Maybe there is a forum for you all to hash out your complaints about one another. It is not here. I don't want to know about it, A, because I think it's a waste of time; and, B, it's not a focus of what I'm focusing on, which is your client's right to conflict-free representation.

I think if we keep our eye on the ball of what Mr. Kelly's interests are and not what our own personal interests are, we can accomplish that objective. Maybe there's a place for you all to argue about what Mr. Greenberg said or what someone else said, but I think it's clear that you were aware at the time that Ms. Rodriguez was representing these two women; correct so far?

MS. BLANK BECKER: That is correct, Judge.

THE COURT: And I think the last time we also established that you were aware also of the rule that a lawyer should not speak to represented people.

MS. BLANK BECKER: That's correct, Judge, and that's why I'm trying to make this record, Judge.

THE COURT: But whatever Mr. Greenberg said isn't part of the record. I am encouraging you to focus on these things. That's my question.

My question is, in your review of your materials is there anything that you want to add about your interactions with these two represented women in connection with this case?

MS. BLANK BECKER: Yes, Judge. With all due respect, I do understand exactly what you're saying. So, thank you, Judge. The reason I brought this up is simply because even though I -- strike that.

I knew that they were represented. Therefore, the same exact day when they text me, I supplied the Court with texts that I responded and I said, Ask Gloria. That was on July 13th. There was a number of texts between July 13th and July 16th that I did not respond to and on the 16th I texted them back, Ask Gloria. And ultimately, Judge, the very next day, the 16th, that's when the women sent me an article which I produced for the Court as well, and they indicated that in their text message that as a result of that article that was on a social media outlet, that they did not want her as their lawyer anymore.

THE COURT: They told you this?

MS. BLANK BECKER: In a text message, Judge, yes, yes. And that was the following day after Mr. Kelly's hearing.

THE COURT: So, is it your position that you thought at that time she was no longer representing them?

MS. BLANK BECKER: I actually still thought she was doing the media stuff with them, yes, I actually did, but they accidentally -- and I think I brought this up last time and it's in the text message as well, they accidentally ended up sending me the termination letter. And, so, I had a chance to read it because at first I didn't know what it was, but it started saying, Hey, Gloria --

THE COURT: I know what it says. It's in the record. And we talked about that the last time.

But it is the case that -- and, you know, you continued to have significant contacts with them and conversations during this period; is that true?

MS. BLANK BECKER: Judge, I had no significant conversations. Did I answer if they would say, what day is court or something to that effect, yes. Did I have significant conversation as has been indicated somewhat by Ms. Rodriguez about legal stuff, never.

THE COURT: Did you have conversations with them about anything having to do with the case?

MS. BLANK BECKER: Yes, I would give them what date if they would ask, Judge. I believe at one point they asked if he needed clothing, a suit, for court. I responded to that. There were several things of that nature that I did

respond to, yes, Judge.

THE COURT: Did you talk to them about their relationship with Ms. Rodriguez? Did they share with you their thoughts about that?

MS. BLANK BECKER: Judge, the only thing I recall them talking about is the message when the article came out that they want to terminate her. That's what I recall.

THE COURT: Okay. Is there anything that you want to put on the record? I'm not trying to keep you from putting anything on the record except to the extent that it has to do with a personal dispute between you and the lawyers. I'm not interested in that unless it somehow connects to this issue, but I don't think it does.

MS. BLANK BECKER: Judge, I was simply trying to put a full picture as to what my understanding was and other than that, Judge, I do not have anything additional. Thank you.

THE COURT: Okay. What about does any co-counsel have anything they want to say on this topic?

Mr. Farinella.

MR. FARINELLA: No.

THE COURT: Mr. Cannick?

MR. CANNICK: No, Your Honor.

THE COURT: From the Government?

MS. CRUZ MELENDEZ: Very briefly and I believe we spoke about this last time. When the Government spoke with

Jane Doe No. 5, she did detail a meeting in approximately August of 2019 in which she had a lengthy conversation with Ms. Blank Becker. During that conversation I believe there were questions concerning her relationship or their relationship with the defendant and information that Ms. Blank Becker thought might be useful for the purposes of Mr. Kelly's defense, some of which information, as we stated in our filing, could be perceived and I think frankly would be perceived, adverse to the defendant's position at trial.

THE COURT: I want to be sure I understand what you're saying. The information that these -- that the witnesses gave to Ms. Becker, you are saying would be --

MS. CRUZ MELENDEZ: Adverse to the defendant's position at trial. And I only raise it for the purposes of making it clear that to the extent that your question was did Ms. Blank Becker have any lengthy conversations with the witnesses, my understanding, based on conversations with Jane Doe No. 5, is that there was at least that meeting in approximately August of 2019.

THE COURT: Do you recall that meeting, having a conversation with them in an interview -- is it just Jane Doe No. 5?

MS. CRUZ MELENDEZ: I believe Ms. Savage was present as well.

MS. BLANK BECKER: Judge, I cannot honestly recall.

Did I have conversations with them, yes. Did I know about their history with my client? For a long time they were not represented by anybody, so I certainly did have conversations with them about their relationship kind of, I would say, but I certainly cannot specifically remember a conversation in August of 2019 where we talked about any specifics or that I gave them any advice adverse to Mr. Kelly.

THE COURT: I do not think that that's what Ms. Cruz Melendez is saying. I think what Ms. Cruz Melendez is saying is that during the course of that conversation, Jane Doe No. 5 gave you information that was not helpful to your client.

MS. CRUZ MELENDEZ: If it's helpful, I can point both the Court and counsel to where we indicated in our letter. I will find that.

THE COURT: Is that the letter of June 24th?

MS. CRUZ MELENDEZ: The June 24th letter, Your Honor. Your Honor it's page three, the first full paragraph.

MS. BLANK BECKER: Judge, may we approach if that's appropriate?

THE COURT: I do not really see any need to approach at this point. We're just talking about this paragraph. I take it you received that letter; correct?

MS. BLANK BECKER: I received all the letters that were on the PACER, yes, Judge, of course.

THE COURT: You're doing that to alert Ms. Blank

Becker of what you're talking about?

MS. CRUZ MELENDEZ: That is a correct.

THE COURT: All right. My recollection was that you said you met them, Jane Doe No. 5 and Ms. Savage, at the -- I think it was at the hearing after Mr. Kelly's arrest on the Illinois federal charge; is that correct? That was my recollection of the testimony or maybe you had talked to them on FaceTime or something before then.

MS. BLANK BECKER: Judge, do I recall that they were at Dunkin' Donuts one day. They were dropped off there prior to court and --

THE COURT: I am talking the first time you met them.

MS. BLANK BECKER: I'm sorry, the very first time, yes, Judge, it was -- I had a FaceTime call with my client months into representing him and he had turned the phone and I had said hello to them, yes.

THE COURT: So you had never had any interaction with them before; correct?

MS. BLANK BECKER: Yes.

THE COURT: And prior to them being represented by Ms. Rodriguez, you hadn't had any -- did you give them any advice whatsoever?

MS. BLANK BECKER: Judge, the first time I was contacted, I believe I supplied that to the Court as well,

was -- I have to look, but I believe it was July 12 or 13 by Jane Doe No. 5.

THE COURT: And so prior to that, you had never -- during the course of your representation of Mr. Kelly, you hadn't had any interaction with them at all in the nature of legal or any advice -- just bearing in mind that I think it's not just -- even if it's how to deal with the media, that is something that is also under the umbrella of legal advice because of somebody's interest in how they're perceived publicly, so I am referring to that as well. Nothing else?

MS. BLANK BECKER: Judge, I may have seen them in court prior to that, but me personally interacting with them, that is correct.

THE COURT: Is there anything else the Government wanted to add?

MS. CRUZ MELENDEZ: Not with respect to this issue, Your Honor.

THE COURT: And anything else from the defense?

MS. BLANK BECKER: No, Judge.

THE COURT: Ms. Haramati anything from you?

MS. HARAMATI: No, Your Honor.

THE COURT: Let me ask Ms. Haramati, do you need to talk to Mr. Kelly any further?

There is one thing that I want to place on the record that is based on my interview with -- my conversation

with Ms. Rodriguez, and after that I want you to tell me if there's some additional conversation that you want to have with him. Obviously I'm not going to relay the specifics because they are protected by the attorney/client privilege, but during the inquiry Ms. Rodriguez related certain instances where she -- where Ms. Becker gave Ms. Rodriguez's clients advice and advice that conflicted with the advice that Ms. Rodriguez had given her clients and, as I said before, even if the discussion is about public image or media or anything of that kind, that is also contained in the definition of legal advice.

There could be two questions here, it could be that if this -- if this advice were given, it's just what Ms. Becker thought was good advice, but she also represents Mr. Kelly and a reasonable person could conclude that she was gaining their confidence and giving them advice that was designed to help Mr. Kelly, not necessarily them.

Now, I am saying that this is what a reasonable person could conclude and I think it is in the record that the, at least from Ms. Rodriguez's perspective, I believe this is -- let me just check with my law clerk.

(Pause in proceedings.)

THE COURT: When the relationship was ended, they told her to send their file to Ms. Becker, so clearly there was -- there were conversations going on and it's a situation

where -- where when you are representing one person and you want to find out what the witnesses have to say, that's fine, but when they are represented, that poses an ethical conflict and not all ethical conflicts require this sort of inquiry or certainly that counsel be taken off the case.

But in this instance, there is a plausible accusation of violating the code, whether or not that actually happens, that can create its own pressures on a lawyer to refute that violation, to refute that accusation.

So, I just want to make sure with Ms. Haramati, I know this is sort of a related issue to some of the other issues that have come up, but do you need any additional time to discuss this particular feature of this with Mr. Kelly?

MS. HARAMATI: Your Honor, we discussed similar issues. I would appreciate if I could speak to Mr. Kelly for a moment before answering the Court whether I need --

THE COURT: Why don't we do that. So you don't have to do that with us all watching here, what the best way to do that? To take him in the back? Okay, let's do that.

We'll be in recess for just a minute.

MS. HARAMATI: Thank you, Your Honor.

(Recess taken.)

THE COURT: Of all, I know it's cold in here. It's either freezing or you're on fire so there is not a whole lot we can do about it. In my experience it is better to be cold

than hot. Anyway, I am sure it will be hot on another day but that's just the way it is.

Let me ask Ms. Haramati, have you had enough time to discuss with Mr. Kelly not just the conflicts that were identified or potential conflicts that were identified in the submissions, but I guess I will say a somewhat different but related one that came up today.

MS. HARAMATI: Yes, Your Honor. Just with this additional time we were able to discuss it sufficiently.

THE COURT: I see. And have you discussed all of those issues that were raised in the letter?

MS. HARAMATI: We spent time discussing all the four other issues that were raised in the Government's -- I think the June 14th letter.

THE COURT: In your view, does he understand what those conflicts are?

MS. HARAMATI: Yes, Your Honor.

THE COURT: Is he capable of waiving those?

MS. HARAMATI: Yes.

MS. CRUZ MELENDEZ: Your Honor?

THE COURT: Go ahead.

MS. CRUZ MELENDEZ: Before Your Honor begins the inquiry, as Your Honor pointed out the Government mentioned additional potential conflicts in its submissions and we would ask that to the extent Your Honor has a concern with respect

to doing a more-detailed inquiry for the purpose of not discussing sealed information, the Court would consider, so that the record is clear and in an abundance of caution, doing the inquiry with respect to those other issues via sidebar or some other method for the purposes of making sure that the -- and for the -- as well as the interest of the defendant and the interest of the Government to make sure that the record is as clear as possible.

THE COURT: I mean, I can do that, but Mr. Kelly is sitting over at the table so I'm not quite sure how that would work. You want him walked over here and ask him over there?

MS. CRUZ MELENDEZ: If that's possible, Your Honor.

THE COURT: I think that when we first met, I mentioned that there were things in there that I think that the Government also agrees are -- there's not a sufficient basis to conclude that they actually happened, but the concern is that anybody -- that a lawyer might be concerned about making sure that this didn't get out or something like that. I can't think of the name of the case but it's akin to a lawyer who --

MS. CRUZ MELENDEZ: *Fulton.*

THE COURT: Right, *Fulton*. The lawyer was accused of something that's not true but the lawyer may have an interest in defending herself or himself from that accusation. I think we can do that without identifying things that are --

that we don't think there's any basis for. I don't think that's necessary as long as we're making reference to, and you can point me to the paragraphs in the letter and I can even have Curcio counsel show that to Mr. Kelly because I know they have discussed it and just --

And Curcio counsel has also advised that she's gone over all of these things with him. I am just going to, for a belt and suspenders, I'm assuming that as part of that conversation that you advised Mr. Kelly that the question isn't whether certain accusations are true or untrue.

One of the possible issues is if there's something, an accusation, out there the concern is that the lawyer's interest will be in defending himself or herself from the accusation regardless of whether it's true.

MS. HARAMATI: Yes, we discussed that.

THE COURT: Does that sound sufficient?

MS. CRUZ MELENDEZ: Your Honor, if the Government has an opportunity to hear the inquiry and then perhaps have an opportunity to be heard afterwards, we'd appreciate it.

THE COURT: You will let me know. So let's get Mr. Kelly the -- I think if counsel can give him the microphone.

Mr. Kelly, just make sure it's on. You are vaccinated?

THE DEFENDANT: Yes, ma'am.

THE COURT: So you can pull it over towards you.

THE DEFENDANT: Thank you.

MS. CRUZ MELENDEZ: Your Honor, if I could note one thing that may make this move a little more smoothly as you begin the inquiry. As defense counsel noted, Mr. Kelly has some reading limitations and so to the extent Your Honor references something in the filing, we would just ask that Ms. Haramati have an opportunity to speak quietly to the defendant so that it's perfectly clear.

THE COURT: So, based on what I've reviewed, Mr. Kelly, I have determined that Ms. Becker has potential conflicts of interest in representing you. I have also determined that you can waive those conflicts if you are informed about what they are and if you consent you can continue to have her represent you.

The conflict, the potential conflicts, arise -- one of them is because of the evidence that Ms. Becker had substantial contacts with potential witnesses and may have developed a relationship of trust with them even though she were never formally retained as their lawyer she has confidentiality obligations to them. And given the nature and extent of those communications and the content of them, she would have a conflict if she were to cross-examine either one of them. So that's one of the conflicts.

Related to that conflict is also this question of

whether there's an ethical violation involved in that -- in those contexts and if there is an ethical violation or an accusation of an ethical violation, the concern is, as I said before in speaking with the Government, the concern is that a person would be motivated to defend himself or herself from the accusation in a way that might keep the lawyer from asking certain questions or calling certain witnesses. That's what the concern is.

The other conflicts which I don't think there's a factual basis for them but it's the same question, and I've asked Curcio counsel, Ms. Haramati, to review with you and advise you about all of those concerns.

Now, the general issue here is that whenever a lawyer has a conflict of interest what's in the lawyer's best interest and what's in your best interest as the client may not be the same and so you have the Constitutional right, as I think I advised you before, to be represented by a lawyer who has no conflict. You also, within certain limitations, have a right to choose your own counsel. We also have a situation where you have two other lawyers and, so, that's also something you can take into account.

So I am going to ask you a series of questions so that I can be sure that, A, that you understand what the conflicts are and that you are in a position to tell me whether you want to waive them. So are you willing to answer

those questions?

THE DEFENDANT: Yes, ma'am, Your Honor.

THE COURT: So, do you have any condition or anything that would interfere with your ability to understand what's happening here in court today?

THE DEFENDANT: No, ma'am.

THE COURT: Okay. Now, you are currently represented by Ms. Blank Becker; is that correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And are you satisfied with her services so far in this case?

THE DEFENDANT: Yes, I am.

THE COURT: All right. And do you intend to go forward with Ms. Blank Becker as one of your lawyers?

THE DEFENDANT: Yes, I do, Your Honor.

THE COURT: And she has had -- as you are aware, there is certainly evidence that she has had sustained communications with potential witnesses in this case. Are you aware of that?

THE DEFENDANT: Yes, ma'am Your Honor.

THE COURT: As I said before, there are risks to being represented by a lawyer who has those conflicts that have been raised in this case. So to the extent there's an attorney/client relationship, it doesn't have to be formal. To the extent that Ms. Becker gave legal advice of any kind do

a potential witness, that means she owes that person a duty of loyalty and she might be prevented from either investigating leads or introducing evidence or challenging a witness's testimony and that includes Jane Doe No. 5 or calling another witness, Ms. Savage, if she were to rely on information that she received in a privileged communication. Do you understand that?

THE DEFENDANT: Yes, I do, Your Honor.

THE COURT: Now, she also may have gotten some privileged information from either of those two witnesses that might help your case, but she can't disclose it to you because of her ethical duties and she couldn't share that information with either Mr. Cannick or Mr. Farinella for the same reasons. Do you understand that?

THE DEFENDANT: Yes, I understand, Your Honor.

THE COURT: She would also be prohibited from cross-examining or doing a direct examination of any witness with whom she had had a privileged conversation, including Jane Doe No. 5 and Ms. Savage, do you understand that?

THE DEFENDANT: Yes, ma'am, Your Honor, I do.

THE COURT: Now, as I said before, she has a duty of loyalty to people that she has given legal advice to regardless of whether there's a formal relationship. That duty continues even after the relationship ends. So she owes a continuing duty of loyalty to former clients or anybody to

whom she gave legal advice. There is a chance that she could make decisions that, consciously or unconsciously, could be influenced by how those decisions might affect the people to whom she owes a continuing duty of loyalty. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And then related to that, although, is the question of becoming an unsworn witness, having gotten information from witnesses. But, again, since you have three lawyers, if that's a concern, one of the other lawyers can take the witness, can do the examination. Do you understand?

THE DEFENDANT: Yes, I do, Your Honor.

THE COURT: Now, in addition to that, there are certain allegations and I think the best thing to do might be just to refer --

I'm going to ask Ms. Cruz Melendez, I think it would be ECF number 107, might contain what the concerns are; is that right?

MS. CRUZ MELENDEZ: The June 14, 2021 letter, which is -- I don't have the ECF number directly in front of me.

THE COURT: That is okay.

MS. CRUZ MELENDEZ: June 14, 2021.

THE COURT: And I'm just going to direct Ms. Haramati to that letter and in particular to the second paragraph of page two and just if you can direct Mr. Kelly to

what I am a talking about.

MS. HARAMATI: I will do that.

THE COURT: And relatedly the information in the paragraph following that.

MS. HARAMATI: I'm sorry, the paragraph following relates to the unsworn witness issue. I believe the second paragraph on page one, is that it?

MS. CRUZ MELENDEZ: So, the second paragraph beginning on page one which goes into page -- the top of page two, as well as the first full paragraph of page two.

THE COURT: You've reviewed those specific --

MS. HARAMATI: We have.

MS. CRUZ MELENDEZ: Your Honor, just one other thing. With respect to the second full paragraph which is technically paragraph three on page two, I just wanted to note that in addition to Jane Doe No. 5, there are additional witnesses or potential witnesses named starting at the end of line three into line four that would also be included in the -- with respect to the unsworn witness issue.

THE COURT: Yeah, we just said that.

MS. CRUZ MELENDEZ: Okay.

THE COURT: I think we did, didn't we?

MS. HARAMATI: I believe we've covered the unsworn witness.

MS. CRUZ MELENDEZ: Thank you, Judge.

THE COURT: That is all right. So, specifically that second paragraph on page two, Mr. Kelly, have you reviewed the contents of that paragraph is Ms. Haramati?

THE DEFENDANT: Yes, Your Honor, I have.

THE COURT: You understand what's contained in them; correct?

THE DEFENDANT: Yes, correct.

THE COURT: And also in the paragraph on the preceding page which I actually think we discussed the last time, but I also don't think there is much of a foundation for it, that also contains a separate allegation and Ms. Haramati reviewed that with you not just today, but in your prior meetings; correct?

THE DEFENDANT: Yes, correct.

THE COURT: And, again, the -- just the general issue is that an attorney who has committed unethical conduct, and I'm not saying that anybody did, but that the general question is that someone who has done something unethical may want to hide that conduct and an attorney who is accused of unethical conduct, even if the person didn't do it, may seek to dispel the impression that she did it or he did it. If the person did it they may want to hide it and if the person didn't do it, they don't want the accusation to come out. That's basically what I am saying to you.

In either situation, the lawyer could make decisions

that aren't in your best interest in order to protect herself or himself from that information. So, again, and I think I mentioned this before, a lawyer may choose not to call a witness or to avoid certain kinds of questioning because of the concern that it could affect the lawyer's career. Do you understand?

THE DEFENDANT: Yes, ma'am.

THE COURT: And the other thing is that an attorney who is accused of wrongdoing or of the -- of some of the things that are contained in that letter, might not be able to give you a completely independent or unbiased assessment of whether you should go to trial, whether you should testify, things like that. Do you understand?

THE DEFENDANT: Yes, I do Your Honor.

THE COURT: Do you have any questions about any of the things that we've talked about so far?

THE DEFENDANT: No, I don't.

THE COURT: There may be, and I identified a few issues here, there may be additional issues that come up. Nobody can predict every possible conflict or issue that may come up and if later in this case there's more information that comes up or the conflicts becomes more serious, I may have -- I don't know that this will happen, but it's always a possibility that I may have no choice but to disqualify the conflicted lawyer at that time. Do you understand?

THE DEFENDANT: Yes, I do, Your Honor.

THE COURT: Now, I explained earlier that the Court appointed a respected member of our bar, Ms. Haramati, who is independent of the case and her role was to advise you of all of these potential conflicts and I understand that she has met with you and advised you about the concerns that are raised in those submissions.

Have you had enough time to consult with her or do you want to get any additional advice or guidance from her? Don't hesitate to ask if you want it. You are not under any pressure to make this decision at this moment. If you would like, we can take a recess. You can consult with Ms. Haramati once more about these issues and, if you want, I will give you a half hour or so to talk to her to make sure you understand everything about it because the next phase, just so you're prepared, I really want to make sure that you understand what the conflicts are, so I will be asking you specifically to describe those to me, and then I am going to ask you just to make sure that you understand what all your rights are in connection with this.

So I think it's probably a really good idea to take a half an hour or so, meet with Ms. Haramati and make sure that you don't have any additional questions. That is what we will do. We will recess for a half an hour. Before we do that, I don't know if there's any other question that either

Ms. Haramati or the Government wants me to put to Mr. Kelly before he consults with Ms. Haramati.

MS. CRUZ MELENDEZ: Nothing from the Government, Your Honor.

THE COURT: Anything else Ms. Haramati?

MS. HARAMATI: No, Your Honor.

THE COURT: Let's recess for that period of time and then we will resume.

(Recess taken.)

THE COURT: All right. Let me just ask Mr. Kelly, have you had enough time to consult with Ms. Haramati about the issues that are involved here and about what you want to do?

THE DEFENDANT: Yes, Your Honor, I have.

THE COURT: And do you think that you are in a position to tell me whether or not you want to waive the conflict of interest?

THE DEFENDANT: I believe so, Your Honor.

THE COURT: So what I would like to start with first, and if you need some time to speak to Ms. Haramati at any time during the course of this inquiry, I will give you as much time as you need, but what I would first like to do is just ask if you can tell me what you understand the potential conflicts to be in general terms and what the risks are that are associated with those potential conflicts.

THE DEFENDANT: Okay, thanks, Your Honor. First of all, as far as Jane Doe No. 5 and Ms. Savage, I understand that as far as Ms. Blank Becker -- it's hard to pronounce, as far as she's concerns if there's a conflict of interest I understand that if I waive, she will be able to question but she will be very limited as far as questioning them.

THE COURT: She may not be able to question them at all.

THE DEFENDANT: And I understand that as well.

THE COURT: And, so, in terms of that portion of it, of the fact that she may be limited in the things that she may ask them. Do you also understand that she cannot share any confidences that she learned from them with any other members of your team?

THE DEFENDANT: Yes, I do, Your Honor.

THE COURT: Now, aside from that representation question, the appearance that perhaps she provided legal advice to them, there's a separate question in connection with that; her contact with them having to do with potential ethical violations and whether or not they were committed is not the question. The question is when a person is accused of that, when a lawyer is accused of that, it might make the lawyer make choices which are not in your best interest. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Can you explain it back to me and if you want to consult with Ms. Haramati, just let me know.

THE DEFENDANT: Just give me one second.

THE COURT: Sure.

(Defendant and counsel confer.)

THE DEFENDANT: Sorry.

THE COURT: That is okay.

THE DEFENDANT: I understand that if Ms. Blank Becker talked to any clients that were represented by another attorney, that she could try to cover that up to make herself look good instead of focusing and paying attention on what she should be doing for me, basically, in my trial. I understand that.

THE COURT: And then there were a couple of other matters that we won't refer to specifically and just for ease of reference, they're the items that Ms. Haramati showed you in that letter. Do you recall what those were?

THE DEFENDANT: Yes, ma'am, I do.

THE COURT: And in general terms, what is your understanding about the reason why that conflict or potential conflict could pose a difficulty for you?

THE DEFENDANT: Well, I think for one, they're rumors and that's all they are to me.

THE COURT: Right, but do you understand the risk that even if something isn't true a person could take steps to

make sure the rumor didn't get out, let's say that. Do you understand that?

THE DEFENDANT: I understand that, Your Honor.

THE COURT: And that's related to what we just talked about with the ethical concerns and you gave a pretty good description of what the concern is. Do you understand that this concern is pretty much the same concern?

THE DEFENDANT: Yes, ma'am, I do.

THE COURT: The final related question to the contact with the witnesses, although this is ameliorated by the presence of other lawyers, is the extent to which having learned things from those witnesses, even putting aside the question of giving legal advice, a lawyer could put herself in the position of being an unsworn witness. That's the third related concern. Do you understand that one? Let me have Ms. Haramati explain it to you once more and then I will give it a shot, too.

MS. HARAMATI: Just one moment, Your Honor.

THE COURT: Sure.

(Defendant and counsel confer.)

MS. HARAMATI: I believe we're ready.

THE COURT: Okay. So what do you understand this potential conflict to mean?

THE DEFENDANT: Your Honor, when the attorney was explaining it to me it sounds perfect and I totally get it. I

just don't know how to repeat everything she just said.

THE COURT: Let me do it this way, and by the way these are not easy concepts for anyone, so I can understand that, but let me just first make sure you do understand what counsel explained to you; correct?

THE DEFENDANT: Yes; correct.

THE COURT: And the risk is, and it's a little bit subtle, but the risk is that if a lawyer has a conversation with a witness and the witness testifies in a different way at trial, the lawyer can certainly question the person about it, but the lawyer can't say that didn't happen, this is what you really said, because the lawyer is not a witness. The lawyer is a lawyer.

How did I do, Ms. Haramati?

MS. BECKER: That's precisely what Mr. Kelly and I discussed.

THE COURT: So that's the reason. The lawyer can't be a witness because the lawyer is a lawyer. Is that clear to you?

THE DEFENDANT: Very clear, Your Honor.

THE COURT: Okay. So I also want to make sure that you understand and I think you do, you have the right to object to having Ms. Becker represent you because of these issues. Do you understand?

THE DEFENDANT: Yes, ma'am, Your Honor.

THE COURT: Okay. And after speaking with Ms. Haramati and hearing what I have explained to you and based on the advice that you have gotten from Ms. Haramati, do you still want to continue with Ms. Becker as your lawyer?

THE DEFENDANT: Yes, ma'am, Your Honor, I do.

THE COURT: And do you understand that by choosing to continue with her you are giving up your right to be represented by a lawyer who does not have a conflict of interest, at least -- you have two lawyers who don't have a conflict of interest, but at least insofar as she is concerned, you are giving up the right to have a third lawyer that doesn't have a conflict. Do you understand?

THE DEFENDANT: That part I don't.

THE COURT: You have two lawyers who as far as I know are not conflicted, you've got Mr. Cannick and Mr. Farinella. There is no allegation that anybody is conflicted. Ms. Becker is not your only lawyer, but I want to be sure that you are giving up the right to have her represent you without a conflict of interest. Do you understand?

PROSPECTIVE JUROR: Yes, I do, Your Honor.

THE COURT: Okay. And that means that if you were to be convicted at a trial, you couldn't later claim that your lawyer, Ms. Becker, wasn't an effective lawyer because she had these conflicts or potential conflicts. Do you understand?

THE DEFENDANT: Yes, I do, Your Honor.

THE COURT: Is there anything else that you need to have explained or that you need to consult with Ms. Haramati about?

THE DEFENDANT: No, no.

THE COURT: Any other questions that the Government wants me to put to Mr. Kelly?

MS. CRUZ MELENDEZ: Nothing, Your Honor.

THE COURT: Okay. I think, based on the record, that we have established that Mr. Kelly is fully competent and capable of making an informed decision, that he has been advised by respected counsel, Ms. Haramati and that his waiver of these potential conflicts or conflicts is knowing and intelligent and so I accept the waiver and at this point, I think it's fine to excuse Mr. Greenberg and Mr. Leonard who I think are on the phone; is that right?

MR. GREENBERG: Yes, Your Honor.

MR. LEONARD: Yes, Judge.

THE COURT: So you are excused from representation in this case.

And, Ms. Haramati, you have the thanks and respect of the Court for your efforts in this regard. I greatly appreciate it and I don't think we need to have Ms. Haramati spend any more time with us here, unless she wants to, okay.

MS. BECKER: Thank you.

THE COURT: Thank you so much.

I do want to address a couple of additional issues. I received Mr. Cannick's letter regarding some sticking points at MDC and before we began this proceeding and I'm sure the Government has something to say about it, but I did speak with Peter Lee, who gave me some answers to those particular questions but I have a second solution to this problem. So I am just going to list what I have learned from Mr. Lee and just bearing in mind that these are, I'm sure you are well aware, that there are certain restrictions about what can be brought into a facility, but nonetheless.

So let's just start in order; the issue of not being able to bring in the binders. I am advised that you can bring in Redwelds but you cannot just bring in a binder with metal and you can bring in folders. The issue with regard to pens and the like, you can bring in pens and pencils and sticky notes, but they can't -- no highlighters or markers.

Now, the issue with the laptops, you are able to bring in multiple laptops, hard drives and there are computers in the visiting room to which the hard drives can be connected. For security reasons, they ordinarily don't allow chargers and this apparently has been the policy in the MDC. But hard drives can be brought in.

Now, just the last thing, and I'm not quite finished with this because I have another suggestion for you, but there's this question of diabetes. Has Mr. Kelly been

diagnosed?

MR. CANNICK: Yes, Your Honor.

THE COURT: Is he on medication, insulin? I know he was diagnosed pre-diabetic. Because of COVID, he can't bring food into the visiting room, but he can come and go to get whatever nourishment he needs, but I also just -- it's not something that was brought to my attention in terms of an actual diagnosis. So if there's a medical order --

MR. CANNICK: Your Honor, we will -- just to let you know, Your Honor, when he showed symptoms the other day of experiencing an episode, he eventually was taken back upstairs.

THE COURT: Okay.

MR. CANNICK: And that took an hour plus away. I thought they were just running him upstairs and getting a candy bar and come back downstairs, but that's not the case. Suffice it to say, we're trying to do the best we can with what we have and we will continue.

THE COURT: The third option is we can also make arrangements to have him produced here three days a week. Now, that has attendant difficulties for Mr. Kelly because that requires him to get up early. There are also restrictions when you -- I'm sure you are aware. There are things that you can't do.

MR. CANNICK: Right.

THE COURT: After this proceeding is over, we will give you the contact information to make that happen if that's what you want. The only thing is you can't do it on a Friday.

MR. CANNICK: Very well. May I have a second?

THE COURT: Sure.

(Pause in proceedings.)

MR. CANNICK: Thank you, Your Honor.

THE COURT: And that may be something that you don't want to do, which I fully understand, but we will see if we can get the -- if that's something that you want to take advantage of.

MR. CANNICK: I will discuss it with the others. I don't know if there will be face-to-face meetings because if you come here there's a screen, there's a mesh. We want to show a computer. I don't think there's any reception in the Marshal's pen and there's a mesh screen where we wouldn't be able to exchange documents.

THE COURT: There will be no internet in either place. That's a security issue in the facility and also downstairs. At least in terms of a hard drive or a thumb drive, and I'm acting like I know how these things work, but you are able to bring those in. So, we can -- you can speak with -- let me make sure if it's all right if we do this.

(Pause in proceedings.)

THE COURT: You can speak with our courtroom deputy

about the mechanics of that other method. Okay?

MR. CANNICK: Okay, thank you.

THE COURT: Now, I just want to also remind the parties of a couple of things. Our final pretrial conference is August 2nd.

MR. CANNICK: Your Honor, is that date flexible?

THE COURT: Yes.

MR. CANNICK: Can we consider August 6th or 5th.

THE COURT: That's not a problem, whichever date you want you.

MR. CANNICK: The 6th around 11.

THE COURT: Sure. I don't anticipate it's going to take very long, but August 6th at 11. Now, the Government has submitted a list of people and organizations and places that will be included in the questionnaire. So jurors will know whether they know any of the organizations or things like that. So the Government submitted that list. I guess it might need to be updated?

MS. CRUZ MELENDEZ: It's possible, Your Honor. There might be -- as we noted in our letter there might be a few names that we would add to the list.

THE COURT: I didn't get a separate list from the defense, but I'm assuming -- take a look at that list, the deadline has passed, but I assume that was because whomever you were going to call or whoever you were concerned about was

on that list.

MR. CANNICK: That's pretty much --

THE COURT: Double check that because the jurors are coming in -- the questionnaires are going to be distributed the week after next.

MR. CANNICK: There are two names that we would like to add. They are they're not witnesses but individuals who will be part of the defense team.

THE COURT: That was going to be my next area. We also will need a list of the people that are going to be in the courtroom. I think everybody is vaccinated, but I don't know if the paralegals --

MR. CANNICK: One is an attorney filing an appearance. Don't get upset, we won't be asking go for additional time. He will be here and ready to go. That will be Calvin Scholar.

THE COURT: So he's going to file a notice of appearance.

MR. CANNICK: Yes. And I don't know if the Government needs to add his name to whatever list that is.

THE COURT: I will let you all work that out. The bottom line is we want to make sure that the jurors, that we don't have a problem.

I do want to make sure that I'm giving you the right information about what information that we will need about the

people who will be here, but I think that we can probably do that separately. I don't want to say anything that doesn't apply.

Then motions in limine are due by July 19th and I know we've received one from the Government and any opposition is July 26th. I will give you a preview. I believe Mr. Cannick is the only one that I have had the pleasure of trying a case with, but just some sort of basic things; this is a fairly low-drama courtroom and so I would like to keep it that way. The other issues generally is I'm not a huge fan of sidebar conferences. I'm not saying an absolute no, but I generally find them to be unnecessary and distracting to the jury. So just a -- it's not something that I look forward to and so I'm going to -- I may not always grant your request for a sidebar conference.

I don't permit speaking objections and, so, just say objection and sometimes you will win and sometimes you won't but usually we just move on from those without extended argument. Of course if there's something that you're just desperate to tell me, we can deal with that, but I think most of the time we can just move on. I usually understand what your objection is, but there doesn't neat to be extended conversation about it.

I will give you some more of those details once we have our final pretrial conference on August the 6th at 11

o'clock. And I just want to know if there's anything else that either side needs to put on the record. Let me start with the Government.

MS. CRUZ MELENDEZ: Nothing further from the Government.

THE COURT: How about the defense?

MR. CANNICK: Nothing currently, Your Honor.

THE COURT: All right. So, Mr. Cannick or whomever, if you want to find out how to go about if you want him brought here, you don't have to, but if you want that, Donna can help you with that.

All right, everyone, thank you so much.

(Proceedings paused.)

MS. SHIHATA: Your Honor, I'm very sorry to get you back in the courtroom, but I thought we could resolve this issue while everyone is here.

THE COURT: That's fine.

MS. SHIHATA: So if I may explain, Your Honor. On July 13th the Government obtained a search warrant for Mr. Kelly's DNA that was signed by the honorable James Cho, a Magistrate Judge in this court. The warrant indicates that we do this at a mutually convenient time and alert defense counsel. We indicated to defense counsel by e-mail yesterday that we proposed doing this while everyone was here in court so as not to inconvenience everyone again, particularly the

issues they have had in meeting with their client and we provided a copy of the warrant. No one objected to that.

I made sure they got a copy of the warrant again when I spoke to them before court this morning. I got an inquiry saying can we get a copy of the affidavit. I said it is currently under seal. We will be filing for a limited unsealing order and when we do, we of course will provide it to you. We were all set and we have our law enforcement officers here to do the swabbing and they just told us that they refuse unless we show them the affidavit. I don't think that is the proper procedure. They're entitled to challenge it after the fact.

THE COURT: I think that's right. You know, I haven't -- I don't -- I'm positive that's not the procedure so there's a warrant. If the warrant authorizes the taking of the DNA, if the warrant -- you can request a hearing after the taking of the DNA on the basis of the Judge's determination, but there is no cause to see the affidavit now.

I'm not saying that you have to do this -- when is that going to be available? When are you going to make the unsealing order?

MS. SHIHATA: I was going to propose, Judge, to make it to you right now, a limited unsealing order for the purposes of providing the affidavit to defense counsel and assuming Your Honor grants it I will do it as soon as I get

back to my office. I will e-mail them the affidavit.

THE COURT: I mean, that's the way to go. And if there is something in the affidavit that makes you think you want to challenge the basis for the warrant, you can do it, but I think it makes the most sense. I mean, you don't want to interrupt your time consulting with Mr. Kelly. So I think if everybody is ready you should go ahead and do it.

MS. SHIHATA: Thank you, Your Honor.

THE COURT: Anything from your side?

MR. CANNICK: We're good. Thank you, Your Honor. We would consent to the Government's application regarding the unsealing order.

THE COURT: It's a limited -- shall I sign it now?

MS. SHIHATA: I will send Donna a copy but it would be a limited unsealing order just for these purposes.

THE COURT: Okay. Thank you, everyone.

(Matter adjourned.)

- ooOoo -

## 1


**1** [1] - 6:18
**10016** [1] - 1:22
**10017** [1] - 2:10
**107** [1] - 36:17
**11** [3] - 51:11, 51:13, 53:25
**11201** [1] - 1:16
**12** [1] - 26:1
**120** [1] - 2:7
**125** [1] - 2:10
**1260** [1] - 2:4
**13** [1] - 26:1
**13th** [6] - 17:11, 17:14, 18:9, 20:14, 54:19
**14** [2] - 36:19, 36:22
**14th** [1] - 29:14
**15** [2] - 1:7, 8:19
**15th** [5] - 8:6, 9:2, 10:9, 10:10, 10:15
**16th** [9] - 8:21, 10:8, 10:11, 10:14, 10:16, 13:13, 20:15, 20:17
**17th** [2] - 4:3, 4:8
**19-CR-286** [1] - 3:5
**19cr286(AMD** [1] - 1:3
**19th** [1] - 53:4
**1:00** [2] - 1:8, 8:21


## 2


**2019** [10] - 6:10, 6:14, 6:18, 6:22, 8:19, 9:22, 9:23, 23:2, 23:19, 24:6
**2021** [4] - 1:7, 17:22, 36:19, 36:22
**20s** [1] - 17:23
**20th** [1] - 2:7
**24th** [2] - 24:15, 24:16
**260** [1] - 1:22
**26th** [1] - 53:6
**271** [1] - 1:16
**2nd** [1] - 51:5


## 4


**444** [1] - 2:1
**45** [1] - 8:20
**48067** [1] - 2:2


## 5


**5** [19] - 5:3, 5:4, 5:10, 5:18, 6:7, 7:6, 11:3, 12:10, 17:12, 23:1, 23:18, 23:22, 24:10, 25:4, 26:2, 35:4, 35:19, 37:16, 42:2
**53** [1] - 2:4
**5:15** [1] - 8:19
**5th** [1] - 51:8


## 6


**60602** [1] - 2:7
**60604-6060** [1] - 2:4
**69-06** [1] - 1:19
**6th** [4] - 51:8, 51:11, 51:13, 53:25


## 8


**8th** [2] - 1:22, 2:10


## A


**ability** [1] - 34:4
**able** [9] - 17:10, 29:9, 39:10, 42:5, 42:7, 48:12, 48:17, 50:17, 50:22
**absolute** [1] - 53:11
**abundance** [1] - 30:3
**accept** [1] - 47:13
**accidentally** [2] - 21:5, 21:6
**accomplish** [1] - 19:15
**account** [1] - 33:21
**accusation** [8] - 28:7, 28:9, 30:24, 31:12, 31:14, 33:3, 33:6, 38:23
**accusations** [1] - 31:10
**accused** [5] - 30:22, 38:19, 39:9, 42:21, 42:22
**acting** [1] - 50:21
**Acting** [1] - 1:15
**actual** [1] - 49:8
**add** [6] - 16:10, 20:5, 26:15, 51:21, 52:7, 52:20
**addition** [2] - 36:13, 37:16
**additional** [14] - 14:19, 15:20, 22:16, 27:2, 28:12, 29:9, 29:24, 37:16, 39:19, 40:9, 40:23, 48:1, 52:15
**additionally** [1] - 17:1
**address** [4] - 4:1, 8:7, 15:3, 48:1
**adjourned** [1] - 56:18
**adult** [1] - 17:7
**advantage** [1] - 50:11
**adverse** [3] - 23:9, 23:13, 24:7
**advice** [20] - 7:22, 12:6, 24:7, 25:23, 26:6, 26:8, 27:7, 27:11, 27:13, 27:14, 27:16, 34:25, 35:22, 36:1, 40:9, 42:18, 44:13, 46:3
**advise** [3] - 4:22, 33:12, 40:4
**advised** [6] - 31:6, 31:9, 33:17, 40:6, 47:11, 48:12
**advising** [1] - 11:8
**affect** [2] - 36:3, 39:5
**affidavit** [6] - 55:5, 55:10, 55:18, 55:24, 56:1, 56:3
**afternoon** [3] - 3:8, 3:14, 3:16
**afterwards** [1] - 31:19
**agrees** [1] - 30:15
**ahead** [5] - 7:17, 11:10, 18:2, 29:21, 56:7
**AIELLO** [1] - 1:19
**akin** [1] - 30:19
**alert** [3] - 9:18, 24:25, 54:22
**allegation** [2] - 38:11, 46:16
**allegations** [1] - 36:14
**allow** [1] - 48:20
**ameliorated** [1] - 44:10
**AMERICA** [1] - 1:3
**Ann** [1] - 3:2
**ANN** [1] - 1:12
**answer** [2] - 21:16, 33:25
**answering** [1] - 28:16
**answers** [1] - 48:5
**anticipate** [1] - 51:12
**anyway** [1] - 29:1
**apologize** [2] - 17:9, 17:25
**apparent** [1] - 14:9
**appearance** [4] - 3:7, 42:17, 52:14, 52:18
**application** [1] - 56:11
**apply** [1] - 53:3
**appointed** [2] - 4:20, 40:3
**appreciate** [3] - 28:15, 31:19, 47:22
**approach** [2] - 24:18, 24:20
**appropriate** [3] - 13:8, 16:12, 24:19
**area** [1] - 52:9
**argue** [1] - 19:16
**argument** [1] - 53:19
**arise** [2] - 4:5, 32:16
**arrangements** [1] - 49:20
**arrest** [1] - 25:5
**article** [3] - 20:17, 20:19, 22:6
**aside** [2] - 42:16, 44:12
**assessment** [1] - 39:11
**Assistant** [1] - 1:18
**associated** [1] - 41:25
**assume** [1] - 51:24
**assuming** [3] - 31:8, 51:23, 55:25
**attempted** [1] - 16:16
**attendant** [1] - 49:21
**attention** [2] - 43:11, 49:7
**Attorney** [1] - 1:15
**attorney** [13] - 3:11, 3:12, 4:5, 10:4, 12:9, 38:16, 38:19, 39:8, 43:10, 44:24, 52:13
**attorney/client** [7] - 5:8, 5:10, 12:23, 13:6, 13:9, 27:4, 34:24
**Attorneys** [1] - 1:18
**August** [7] - 23:2, 23:19, 24:6, 51:5, 51:8, 51:13, 53:25
**authorizes** [1] - 55:15
**available** [1] - 55:20
**Ave** [2] - 2:1, 2:10
**Avenue** [2] - 1:19, 1:22
**avoid** [1] - 39:4
**aware** [7] - 17:14, 19:18, 19:22, 34:16, 34:19, 48:9, 49:23


## B


**ball** [1] - 19:13
**bar** [2] - 40:3, 49:16
**based** [6] - 17:9, 23:17, 26:25, 32:10,

46:3, 47:8
**basic** [1] - 53:8
**basis** [5] - 30:16, 31:1, 33:10, 55:17, 56:4
**bearing** [3] - 15:25, 26:6, 48:8
**Becker** [38] - 3:10, 4:13, 6:20, 6:21, 7:6, 7:9, 8:19, 10:23, 11:5, 11:6, 11:14, 11:15, 13:13, 13:17, 13:25, 14:10, 14:11, 14:13, 15:22, 23:3, 23:6, 23:12, 23:16, 25:1, 27:6, 27:14, 27:24, 32:11, 32:17, 34:8, 34:14, 34:25, 42:3, 43:9, 45:23, 46:4, 46:17, 46:23
**BECKER** [36] - 2:2, 3:10, 15:2, 15:15, 16:11, 16:19, 16:22, 17:1, 17:6, 17:8, 17:21, 17:25, 18:3, 18:15, 18:19, 18:21, 19:20, 19:24, 20:7, 20:23, 21:3, 21:15, 21:22, 22:5, 22:14, 23:25, 24:18, 24:23, 25:9, 25:14, 25:20, 25:24, 26:11, 26:19, 45:15, 47:24
**Becker's** [1] - 12:12
**becomes** [1] - 39:22
**becoming** [1] - 36:8
**BEFORE** [1] - 1:12
**began** [2] - 4:3, 48:3
**begin** [1] - 32:5
**beginning** [1] - 37:9
**begins** [1] - 29:22
**behalf** [1] - 3:10
**behavior** [1] - 14:14
**belabor** [1] - 16:12
**belt** [1] - 31:8
**best** [7] - 28:18, 33:14, 33:15, 36:14, 39:1, 42:23, 49:17
**better** [1] - 28:25
**between** [2] - 20:14, 22:11
**binder** [1] - 48:13
**binders** [1] - 48:12
**bit** [4] - 4:23, 8:15, 12:16, 45:7
**Blank** [1] - 3:10
**blank** [8] - 23:3, 23:5, 23:16, 24:25, 34:8, 34:14, 42:3, 43:8
**BLANK** [35] - 2:1, 2:2, 3:10, 15:2, 15:15, 16:11, 16:19, 16:22, 17:1, 17:6, 17:8, 17:21, 17:25, 18:3, 18:15, 18:19, 18:21, 19:20, 19:24, 20:7, 20:23, 21:3, 21:15, 21:22, 22:5, 22:14, 23:25, 24:18, 24:23, 25:9, 25:14, 25:20, 25:24, 26:11, 26:19
**blurred** [2] - 8:11, 8:12
**bond** [2] - 6:22, 13:20
**bottom** [1] - 52:22
**breakdown** [1] - 12:3
**brief** [1] - 13:22
**briefly** [1] - 22:24
**bring** [8] - 48:12, 48:13, 48:14, 48:15, 48:18, 49:4, 50:22
**Brooklyn** [2] - 1:6, 1:16
**brought** [6] - 20:9, 21:5, 48:10, 48:22, 49:7, 54:10
**Building** [1] - 6:24
**building** [1] - 6:25
**BY** [2] - 1:17, 1:20
**BY:ILANA** [1] - 2:11
**BY:MICHAEL** [1] - 2:8
**BY:NICOLE** [1] - 2:2
**BY:STEVEN** [1] - 2:5
**BY:THOMAS** [1] - 1:23

## C

**Cadman** [1] - 1:16
**Calvin** [1] - 52:16
**candy** [1] - 49:16
**Cannick** [5] - 3:12, 35:13, 46:15, 53:7, 54:8
**CANNICK** [20] - 1:19, 1:20, 22:22, 49:2, 49:9, 49:14, 49:25, 50:4, 50:7, 50:12, 51:2, 51:6, 51:8, 51:11, 52:2, 52:6, 52:13, 52:19, 54:7, 56:10
**cannick** [1] - 22:21
**Cannick's** [2] - 3:25, 48:2
**cannot** [4] - 23:25, 24:5, 42:12, 48:13
**capable** [2] - 29:18, 47:10
**care** [1] - 4:14
**career** [1] - 39:5
**case** [19] - 7:23, 11:7, 13:20, 19:4, 19:5, 20:6, 21:12, 21:21, 28:5, 30:19, 34:11, 34:18, 34:23, 35:11, 39:21, 40:4, 47:19, 49:16, 53:8
**CAUSE** [1] - 1:11
**caution** [1] - 30:3
**Center** [1] - 6:22
**center** [1] - 6:23
**certain** [8] - 27:5, 31:10, 33:7, 33:18, 36:14, 39:4, 48:9
**certainly** [5] - 24:3, 24:5, 28:5, 34:17, 45:10
**challenge** [2] - 55:11, 56:4
**challenging** [1] - 35:3
**chance** [4] - 15:23, 16:14, 21:7, 36:1
**charge** [1] - 25:6
**chargers** [1] - 48:21
**check** [2] - 27:21, 52:3
**Chicago** [4] - 2:4, 2:7, 6:24, 13:21
**Cho** [1] - 54:20
**choice** [1] - 39:24
**choices** [1] - 42:23
**choose** [2] - 33:19, 39:3
**choosing** [1] - 46:6
**claim** [1] - 46:22
**clear** [8] - 10:6, 19:17, 23:15, 30:3, 30:8, 32:9, 45:18, 45:20
**clearly** [1] - 27:24
**clerk** [1] - 27:21
**client** [5] - 24:2, 24:11, 25:15, 33:15, 55:1
**client's** [1] - 19:11
**clients** [11] - 5:18, 7:14, 11:16, 11:22, 12:4, 12:8, 14:7, 27:6, 27:8, 35:25, 43:9
**clothing** [1] - 21:24
**co** [1] - 22:17
**co-counsel** [1] - 22:17
**code** [1] - 28:7
**cold** [2] - 28:23, 28:25
**coming** [3] - 11:13, 17:18, 52:4
**committed** [2] - 38:16, 42:20
**communicated** [1] - 8:8
**communicating** [1] - 14:7
**communication** [2] - 6:5, 35:6
**communications** [6] - 13:6, 14:11, 17:4, 18:14, 32:22, 34:18
**competent** [1] - 47:9
**complaints** [1] - 19:8
**complete** [1] - 14:20
**completely** [1] - 39:11
**computer** [1] - 50:15
**computers** [1] - 48:18
**concepts** [1] - 45:3
**concern** [14] - 10:7, 14:12, 29:25, 30:16, 31:12, 33:3, 33:4, 33:8, 36:10, 39:5, 44:6, 44:7, 44:15
**concerned** [3] - 30:17, 46:11, 51:25
**concerning** [2] - 12:13, 23:4
**concerns** [6] - 13:17, 33:12, 36:17, 40:6, 42:4, 44:5
**conclude** [3] - 27:15, 27:19, 30:16
**conclusion** [1] - 10:1
**condition** [1] - 34:3
**conduct** [3] - 38:16, 38:19, 38:20
**confer** [2] - 43:5, 44:20
**conference** [4] - 15:23, 51:4, 53:15, 53:25
**conferences** [1] - 53:11
**confidence** [1] - 27:16
**confidences** [1] - 42:13
**confidentiality** [1] - 32:21
**conflict** [24] - 4:13, 4:16, 4:17, 4:19, 5:1, 16:1, 16:5, 19:11, 28:3, 32:16, 32:23, 32:25, 33:14, 33:18, 39:20, 41:17, 42:4, 43:20, 43:21, 44:23, 46:8, 46:10, 46:12, 46:19
**conflict-free** [3] - 4:17, 16:1, 19:11
**conflicted** [4] - 27:7, 39:25, 46:15, 46:17
**conflicts** [23] - 4:5, 4:22, 28:4, 29:4, 29:5, 29:16, 29:24, 32:12, 32:13, 32:16, 32:24, 33:9, 33:24, 34:22, 39:22, 40:5, 40:17, 41:24, 41:25, 46:24, 47:12
**connected** [1] - 48:20
**connection** [5] - 4:6, 7:2, 20:6, 40:20, 42:18
**connects** [1] - 22:12
**consciously** [1] - 36:2
**consent** [2] - 32:14, 56:11
**consider** [2] - 30:2, 51:8
**Constitutional** [1] - 33:16

**consult** [5] - 40:8, 40:12, 41:11, 43:2, 47:2
**consulting** [1] - 56:6
**consults** [1] - 41:2
**contact** [9] - 6:19, 7:14, 8:12, 11:4, 12:12, 18:4, 42:19, 44:10, 50:2
**contacted** [1] - 25:25
**contacting** [1] - 10:24
**contacts** [3] - 10:15, 21:13, 32:18
**contain** [1] - 36:17
**contained** [3] - 27:10, 38:5, 39:10
**contains** [1] - 38:11
**content** [1] - 32:22
**contents** [1] - 38:3
**contexts** [1] - 33:2
**continuation** [1] - 4:2
**continue** [4] - 32:15, 46:4, 46:7, 49:18
**continued** [2] - 14:10, 21:13
**continues** [1] - 35:24
**continuing** [4] - 11:16, 14:14, 35:25, 36:4
**contradictory** [1] - 11:8
**contrary** [1] - 12:6
**convenient** [1] - 54:22
**conversation** [24] - 5:11, 8:8, 10:12, 11:5, 13:11, 13:12, 13:14, 13:16, 13:18, 13:22, 13:24, 21:18, 23:2, 23:3, 23:21, 24:5, 24:10, 26:25, 27:2, 31:9, 35:18, 45:8, 53:23
**conversations** [14] - 10:23, 11:21, 17:16, 17:17, 18:23, 21:14, 21:16, 21:20, 23:16, 23:17, 24:1, 24:3, 27:25
**convicted** [1] - 46:22
**copy** [4] - 55:2, 55:3, 55:5, 56:14
**correct** [24] - 3:20, 5:21, 5:22, 9:15, 9:23, 10:12, 10:13, 11:24, 17:8, 19:19, 19:20, 19:24, 24:22, 25:2, 25:6, 25:19, 26:13, 34:8, 38:6, 38:7, 38:13, 38:14, 45:5, 45:6
**counsel** [23] - 2:9, 3:7, 3:15, 4:21, 5:2, 15:10, 16:2, 22:17, 24:13, 28:5, 31:4, 31:6, 31:21, 32:5, 33:11, 33:19, 43:5, 44:20, 45:5, 47:11, 54:23, 55:24
**couple** [4] - 13:19, 43:14, 48:1, 51:4
**course** [6] - 24:10, 24:24, 26:4, 41:21, 53:19, 55:7
**court** [12] - 3:1, 5:13, 6:3, 17:18, 21:17, 21:24, 25:11, 26:12, 34:5, 54:21, 54:24, 55:4
**Court** [13] - 12:22, 13:11, 15:3, 17:2, 17:11, 20:12, 20:18, 24:13, 25:25, 28:16, 30:2, 40:2, 47:21
**COURT** [186] - 1:1, 1:24, 3:14, 3:16, 3:19, 3:23, 5:20, 5:23, 6:2, 6:7, 6:11, 6:15, 6:19, 6:23, 7:1, 7:5, 7:9, 7:12, 7:15, 7:17, 7:20, 7:24, 8:3, 8:9, 8:14, 8:25, 9:4, 9:8, 9:13, 9:17, 9:21, 9:25, 10:8, 10:11, 10:15, 10:22, 11:2, 11:10, 11:19, 11:25, 12:15, 12:21, 13:3, 13:5, 14:4, 14:8, 14:16, 14:23, 15:5, 15:9, 15:13, 15:16, 15:19, 16:18, 16:20, 16:25, 17:5, 17:7, 17:20, 17:22, 18:2, 18:13, 18:17, 18:20, 18:25, 19:21, 20:1, 20:22, 21:1, 21:10, 21:20, 22:2, 22:8, 22:17, 22:21, 22:23, 23:10, 23:20, 24:8, 24:15, 24:20, 24:25, 25:3, 25:12, 25:18, 25:21, 26:3, 26:14, 26:18, 26:20, 26:22, 27:23, 28:17, 28:23, 29:10, 29:15, 29:18, 29:21, 30:9, 30:13, 30:22, 31:16, 31:20, 32:1, 32:10, 34:3, 34:7, 34:10, 34:13, 34:16, 34:21, 35:9, 35:16, 35:21, 36:7, 36:13, 36:21, 36:23, 37:3, 37:11, 37:20, 37:22, 38:1, 38:5, 38:8, 38:15, 39:8, 39:15, 39:18, 40:2, 41:5, 41:7, 41:10, 41:15, 41:19, 42:7, 42:10, 42:16, 43:1, 43:4, 43:7, 43:14, 43:19, 43:24, 44:4, 44:9, 44:19, 44:22, 45:2, 45:7, 45:17, 45:21, 46:1, 46:6, 46:14, 46:21, 47:1, 47:5, 47:8, 47:18, 47:25, 49:3, 49:13, 49:19, 50:1, 50:5, 50:8, 50:18, 50:25, 51:3, 51:7, 51:9, 51:12, 51:22, 52:3, 52:9, 52:17, 52:21, 54:6, 54:8, 54:17, 55:13, 56:2, 56:9, 56:13, 56:16
**Court's** [1] - 4:4
**Courthouse** [1] - 1:5
**COURTROOM** [1] - 3:4
**courtroom** [6] - 3:22, 12:25, 50:25, 52:11, 53:9, 54:15
**cover** [1] - 43:10
**covered** [1] - 37:23
**COVID** [1] - 49:4
**create** [1] - 28:8
**CRIMINAL** [1] - 1:11
**criminal** [1] - 3:4
**cross** [2] - 32:23, 35:17
**cross-examine** [1] - 32:23
**cross-examining** [1] - 35:17
**CRUZ** [26] - 1:17, 14:22, 15:7, 22:24, 23:13, 23:23, 24:12, 24:16, 25:2, 26:16, 29:20, 29:22, 30:12, 30:21, 31:17, 32:3, 36:19, 36:22, 37:8, 37:13, 37:21, 37:25, 41:3, 47:7, 51:19, 54:4
**Cruz** [4] - 3:9, 24:8, 24:9, 36:16
**CURCIO** [1] - 1:11
**Curcio** [9] - 2:9, 3:5, 3:15, 4:2, 4:20, 15:10, 31:4, 31:6, 33:11

## D

**date** [6] - 6:12, 6:13, 13:14, 21:22, 51:6, 51:9
**days** [1] - 49:20
**deadline** [1] - 51:24
**deal** [2] - 26:7, 53:20
**decision** [2] - 40:11, 47:10
**decisions** [3] - 36:2, 36:3, 38:25
**defend** [1] - 33:5
**defendant** [4] - 1:7, 23:5, 30:6, 32:9
**DEFENDANT** [41] - 31:25, 32:2, 34:2, 34:6, 34:9, 34:12, 34:15, 34:20, 35:8, 35:15, 35:20, 36:6, 36:12, 38:4, 38:7, 38:14, 39:7, 39:14, 39:17, 40:1, 41:14, 41:18, 42:1, 42:9, 42:15, 42:25, 43:3, 43:6, 43:8, 43:18, 43:22, 44:3, 44:8, 44:24, 45:6, 45:20, 45:25, 46:5, 46:13, 46:25, 47:4
**Defendant** [5] - 1:19, 1:21, 3:3, 43:5, 44:20
**defendant's** [2] - 23:9, 23:13
**defending** [2] - 30:24, 31:13
**defense** [9] - 23:7, 26:18, 32:5, 51:23, 52:8, 54:6, 54:22, 54:23, 55:24
**definition** [1] - 27:11
**delay** [2] - 7:18, 8:15
**deputy** [1] - 50:25
**DEPUTY** [1] - 3:4
**describe** [3] - 13:10, 13:18, 40:18
**described** [2] - 13:7, 13:12
**description** [1] - 44:6
**designed** [1] - 27:17
**desperate** [1] - 53:20
**despite** [1] - 11:5
**detail** [1] - 23:1
**detailed** [1] - 30:1
**details** [1] - 53:24
**determination** [1] - 55:17
**determined** [2] - 32:11, 32:13
**developed** [1] - 32:19
**DEVEREAUX** [1] - 1:20
**Devereux** [1] - 3:12
**device** [1] - 9:11
**diabetes** [1] - 48:25
**diabetic** [1] - 49:4
**diagnosed** [2] - 49:1, 49:4
**diagnosis** [1] - 49:8
**different** [3] - 13:21, 29:6, 45:9
**difficult** [1] - 16:3
**difficulties** [1] - 49:21
**difficulty** [1] - 43:21
**direct** [3] - 35:17, 36:23, 36:25
**directly** [1] - 36:20
**Dirksen** [3] - 6:22, 6:25, 7:1
**disagreements** [1] - 16:7
**disclose** [1] - 35:11
**discrete** [1] - 4:11
**discuss** [5] - 5:15, 28:13, 29:4, 29:9, 50:12
**discussed** [7] - 8:22, 28:14, 29:10, 31:5, 31:15, 38:9, 45:16
**discussing** [2] - 29:12, 30:2
**discussion** [4] - 5:25, 12:12, 18:3, 27:9
**discussions** [1] - 6:4
**dispel** [1] - 38:21
**dispute** [1] - 22:11
**disputes** [2] - 4:10, 16:6
**disqualify** [1] - 39:24
**distracting** [1] - 53:12

**distributed** [1] - 52:4
**DISTRICT** [3] - 1:1, 1:1, 1:12
**District** [1] - 1:15
**divulge** [1] - 11:21
**DNA** [3] - 54:20, 55:16, 55:17
**docket** [1] - 3:5
**documents** [1] - 50:17
**Doe** [20] - 5:3, 5:4, 5:10, 5:18, 5:24, 6:7, 7:6, 11:3, 12:10, 17:12, 23:1, 23:18, 23:21, 24:10, 25:4, 26:2, 35:4, 35:19, 37:16, 42:2
**done** [1] - 38:18
**Donna** [2] - 54:10, 56:14
**Donnelly** [1] - 3:2
**DONNELLY** [1] - 1:12
**Donuts** [1] - 25:10
**double** [1] - 52:3
**doubt** [1] - 11:15
**downstairs** [2] - 49:16, 50:20
**drama** [1] - 53:9
**drawn** [1] - 10:5
**drive** [2] - 50:20, 50:21
**drives** [3] - 48:18, 48:19, 48:22
**dropped** [1] - 25:10
**due** [2] - 20:7, 53:4
**Dunkin'** [1] - 25:10
**during** [7] - 13:14, 21:14, 23:3, 24:10, 26:4, 27:5, 41:21
**duties** [1] - 35:12
**duty** [5] - 35:1, 35:21, 35:24, 35:25, 36:4

**E**

**E-mail** [1] - 1:25
**e-mail** [11] - 4:25, 8:2, 8:7, 8:16, 10:16, 10:18, 10:20, 10:21, 54:23, 56:1
**early** [2] - 6:13, 49:22
**ease** [1] - 43:15
**East** [1] - 1:16
**EASTERN** [1] - 1:1
**Eastern** [1] - 1:15
**easy** [1] - 45:3
**ECF** [2] - 36:17, 36:20
**effect** [3] - 14:2, 14:15, 21:17
**effective** [1] - 46:23
**efforts** [2] - 4:21, 47:21
**either** [10] - 10:24, 28:24, 32:23, 35:2, 35:10, 35:13, 38:25, 40:25, 50:18, 54:2
**encouraged** [1] - 12:5
**encouraging** [1] - 20:2
**end** [3] - 4:1, 13:24, 37:17
**ended** [2] - 21:6, 27:23
**ends** [1] - 35:24
**enforcement** [1] - 55:8
**entitled** [2] - 4:18, 55:11
**episode** [1] - 49:11
**ESQ** [9] - 1:14, 1:17, 1:17, 1:20, 1:23, 2:2, 2:5, 2:8, 2:11
**established** [2] - 19:22, 47:9
**ethical** [8] - 28:3, 28:4, 33:1, 33:2, 33:3, 35:12, 42:20, 44:5
**eventually** [1] - 49:11
**evidence** [3] - 32:17, 34:17, 35:3
**ex** [4] - 5:11, 12:22, 13:12, 13:15
**exact** [3] - 6:12, 6:13, 20:12
**exactly** [1] - 20:8
**examination** [2] - 35:17, 36:11
**examine** [1] - 32:23
**examining** [1] - 35:17
**example** [1] - 9:8
**except** [1] - 22:10
**exchange** [1] - 50:17
**excuse** [2] - 19:6, 47:14
**excused** [1] - 47:18
**experience** [1] - 28:25
**experiencing** [1] - 49:11
**explain** [4] - 19:7, 43:1, 44:16, 54:18
**explained** [5] - 4:19, 40:2, 45:5, 46:2, 47:2
**explaining** [1] - 44:25
**extended** [2] - 53:18, 53:22
**extent** [11] - 4:12, 4:16, 5:14, 22:10, 23:15, 29:25, 32:6, 32:22, 34:23, 34:25, 44:11
**eye** [1] - 19:13

**F**

**face** [2] - 50:13
**face-to-face** [1] - 50:13
**FaceTime** [2] - 25:8, 25:15
**facility** [2] - 48:10, 50:19
**fact** [2] - 42:11, 55:12
**factual** [2] - 16:4, 33:10
**fairly** [1] - 53:9
**fan** [1] - 53:10
**far** [10] - 3:12, 12:19, 19:19, 34:11, 39:16, 42:2, 42:3, 42:4, 42:6, 46:14
**FARINELLA** [3] - 1:21, 1:23, 22:20
**farinella** [3] - 22:19, 35:13, 46:16
**Farinella** [1] - 3:12
**feature** [1] - 28:13
**federal** [2] - 13:20, 25:6
**Federal** [1] - 6:24
**FEIN** [1] - 2:9
**felt** [1] - 12:13
**few** [2] - 39:18, 51:21
**file** [3] - 12:9, 27:24, 52:17
**filing** [4] - 23:8, 32:7, 52:13, 55:6
**final** [3] - 44:9, 51:4, 53:25
**fine** [6] - 7:20, 12:1, 28:2, 47:14, 54:17
**finish** [2] - 8:15, 18:16
**finished** [2] - 13:1, 48:23
**fire** [1] - 28:24
**first** [16] - 3:7, 6:19, 6:21, 7:7, 10:14, 21:8, 24:17, 25:12, 25:14, 25:24, 30:13, 37:10, 41:20, 41:22, 42:1, 45:4
**flexible** [1] - 51:6
**Floor** [3] - 1:22, 2:7, 2:10
**focus** [3] - 16:1, 19:10, 20:2
**focusing** [2] - 19:11, 43:11
**folders** [1] - 48:14
**following** [6] - 10:15, 10:22, 13:14, 20:24, 37:4, 37:5
**food** [1] - 49:5
**FOR** [1] - 1:11
**form** [4] - 7:15, 7:24, 8:1
**formal** [2] - 34:24, 35:23
**formally** [2] - 12:6, 32:20
**former** [1] - 35:25
**forum** [1] - 19:7
**forward** [3] - 16:13, 34:14, 53:13
**foundation** [1] - 38:10
**four** [2] - 29:12, 37:18
**frankly** [1] - 23:8
**free** [4] - 4:17, 15:17, 16:1, 19:11
**freezing** [1] - 28:24
**Friday** [1] - 50:3
**front** [1] - 36:20
**full** [4] - 22:15, 24:17, 37:10, 37:14
**fully** [2] - 47:9, 50:9
**Fulton** [2] - 30:21, 30:22

**G**

**gaining** [1] - 27:16
**general** [5] - 33:13, 38:15, 38:17, 41:24, 43:19
**generally** [2] - 53:10, 53:12
**girls** [3] - 17:4, 17:18, 17:23
**given** [5] - 16:15, 27:8, 27:13, 32:21, 35:22
**glad** [2] - 10:3
**Gloria** [6] - 10:3, 17:13, 18:6, 20:13, 20:16, 21:9
**Government** [23] - 1:14, 3:7, 14:18, 15:7, 22:23, 22:25, 26:14, 29:23, 30:7, 30:15, 31:17, 33:4, 41:1, 41:3, 47:5, 48:4, 51:13, 51:17, 52:20, 53:5, 54:3, 54:5, 54:19
**Government's** [2] - 29:13, 56:11
**Grand** [1] - 1:19
**grant** [1] - 53:14
**grants** [1] - 55:25
**great** [1] - 15:18
**greatly** [1] - 47:21
**Greenberg** [16] - 3:17, 4:14, 13:17, 13:21, 13:23, 14:1, 14:12, 16:8, 17:16, 17:17, 18:5, 18:21, 19:4, 19:16, 20:1, 47:14
**greenberg** [1] - 10:14
**GREENBERG** [4] - 2:3, 2:5, 3:17, 47:16
**guess** [2] - 29:6, 51:17
**guidance** [1] - 40:9

## H


**half** [3] - 40:14, 40:22, 40:24
**hand** [1] - 9:12
**HARAMATI** [18] - 2:11, 3:15, 15:12, 26:21, 28:14, 28:21, 29:8, 29:12, 29:17, 29:19, 31:15, 37:2, 37:5, 37:12, 37:23, 41:6, 44:18, 44:21
**haramati** [1] - 26:20
**Haramati** [28] - 3:15, 4:20, 26:22, 28:10, 29:3, 32:8, 33:11, 36:24, 38:3, 38:11, 40:3, 40:12, 40:22, 41:1, 41:2, 41:5, 41:11, 41:20, 43:2, 43:16, 44:16, 45:14, 46:2, 46:3, 47:2, 47:11, 47:20, 47:22
**hard** [5] - 42:3, 48:18, 48:19, 48:22, 50:20
**hash** [1] - 19:8
**hear** [6] - 3:24, 7:19, 13:3, 15:10, 15:19, 31:18
**heard** [1] - 31:19
**HEARING** [1] - 1:11
**hearing** [14] - 3:5, 4:2, 4:3, 4:9, 6:22, 8:22, 13:20, 15:24, 16:1, 18:10, 20:25, 25:5, 46:2, 55:16
**hello** [1] - 25:17
**help** [3] - 27:17, 35:11, 54:11
**helpful** [2] - 24:11, 24:12
**herself** [6] - 30:24, 31:13, 33:5, 39:1, 43:10, 44:13
**hesitate** [1] - 40:10
**hide** [2] - 38:19, 38:22
**highlighters** [1] - 48:16
**himself** [4] - 30:24, 31:13, 33:5, 39:2
**hired** [1] - 17:13
**history** [1] - 24:2
**Hon** [1] - 3:2
**honestly** [1] - 23:25
**Honor** [68] - 3:8, 3:21, 5:19, 6:1, 11:24, 13:4, 13:19, 14:22, 15:12, 15:18, 22:22, 24:17, 26:17, 26:21, 28:14, 28:21, 29:8, 29:17, 29:20, 29:22, 29:23, 29:25, 30:12, 31:17, 32:3, 32:6, 34:2, 34:9, 34:15, 34:20, 35:8, 35:15, 35:20, 36:6, 36:12, 37:13, 38:4, 39:14, 40:1, 41:4, 41:6, 41:14, 41:18, 42:1, 42:15, 44:3, 44:18, 44:24, 45:20, 45:25, 46:5, 46:20, 46:25, 47:7, 47:16, 49:2, 49:9, 49:10, 50:7, 51:6, 51:19, 54:7, 54:14, 54:18, 55:25, 56:8, 56:10
**HONORABLE** [1] - 1:12
**honorable** [1] - 54:20
**hot** [2] - 29:1
**hour** [4] - 40:14, 40:22, 40:24, 49:14
**huge** [1] - 53:10


## I


**idea** [1] - 40:21
**identified** [3] - 29:5, 39:18
**identifying** [1] - 30:25
**IL** [2] - 2:4, 2:7
**Ilana** [1] - 3:15
**Illinois** [1] - 25:6
**image** [1] - 27:9
**impatient** [1] - 19:1
**implicate** [2] - 5:8, 13:8
**implicated** [1] - 13:6
**implicates** [1] - 5:15
**impression** [1] - 38:21
**in-person** [1] - 8:2
**incident** [1] - 13:7
**included** [4] - 4:24, 9:13, 37:18, 51:15
**includes** [1] - 35:4
**including** [1] - 35:18
**inconvenience** [1] - 54:25
**independent** [2] - 39:11, 40:4
**independently** [1] - 10:19
**indicated** [5] - 18:5, 20:18, 21:18, 24:13, 54:23
**indicates** [1] - 54:21
**indicating** [1] - 17:12
**individuals** [1] - 52:7
**influenced** [1] - 36:3
**information** [22] - 11:6, 11:8, 11:17, 11:20, 12:5, 12:12, 12:16, 23:5, 23:7, 23:11, 24:11, 30:2, 35:5, 35:10, 35:12, 36:9, 37:3, 39:2, 39:21, 50:2, 52:25
**informed** [2] - 32:14, 47:10
**inquiries** [1] - 16:3
**inquiry** [13] - 5:12, 12:18, 12:22, 13:15, 27:5, 28:4, 29:23, 30:1, 30:4, 31:18, 32:5, 41:21, 55:5
**insofar** [1] - 46:10
**instance** [1] - 28:6
**instances** [1] - 27:5
**instead** [1] - 43:11
**instruction** [1] - 12:7
**instructions** [4] - 7:10, 7:12, 7:25, 8:4
**insulin** [1] - 49:3
**intelligent** [1] - 47:13
**intend** [1] - 34:13
**intention** [1] - 19:5
**interacting** [1] - 26:12
**interaction** [2] - 25:18, 26:5
**interactions** [2] - 7:10, 20:5
**interest** [19] - 4:5, 4:15, 5:1, 26:9, 30:6, 30:7, 30:24, 31:13, 32:12, 33:14, 33:15, 39:1, 41:17, 42:4, 42:23, 46:9, 46:10, 46:19
**interested** [5] - 4:11, 4:16, 14:25, 19:3, 22:12
**interests** [4] - 7:23, 11:18, 19:14, 19:15
**interfere** [1] - 34:4
**internet** [1] - 50:18
**interrupt** [1] - 56:6
**interview** [2] - 23:21, 26:25
**introducing** [1] - 35:3
**investigate** [1] - 4:4
**investigating** [1] - 35:2
**involve** [2] - 5:9, 6:4
**involved** [2] - 33:1, 41:12
**issue** [17] - 11:12, 13:22, 14:21, 15:24, 22:12, 26:16, 28:11, 33:13, 37:6, 37:19, 38:16, 39:20, 48:11, 48:14, 48:17, 50:19, 54:16
**issues** [16] - 4:12, 14:24, 28:12, 28:15, 29:11, 29:13, 30:4, 31:11, 39:19, 40:13, 41:12, 45:24, 48:1, 53:10, 55:1
**item** [1] - 13:7
**items** [1] - 43:16


## J


**Jackson** [1] - 2:4
**JACQUELYN** [1] - 1:14
**James** [1] - 54:20
**Jane** [20] - 5:3, 5:4, 5:10, 5:18, 5:24, 6:7, 7:6, 11:3, 12:10, 17:12, 23:1, 23:17, 23:21, 24:10, 25:4, 26:2, 35:4, 35:19, 37:16, 42:2
**jointly** [1] - 6:17
**Joycelyn** [1] - 6:8
**Judge** [27] - 3:13, 15:15, 16:11, 17:1, 17:9, 17:10, 17:25, 18:11, 18:15, 18:21, 19:20, 19:24, 19:25, 20:7, 20:9, 20:16, 20:23, 21:23, 22:1, 22:16, 24:24, 25:15, 26:19, 37:25, 47:17, 54:21, 55:22
**judge** [12] - 16:11, 16:14, 16:22, 17:9, 21:15, 22:5, 22:14, 23:25, 24:18, 25:9, 25:24, 26:11
**JUDGE** [1] - 1:12
**Judge's** [1] - 55:17
**July** [22] - 1:7, 6:9, 6:13, 6:22, 8:6, 8:19, 8:21, 9:2, 10:8, 10:9, 10:10, 10:14, 13:13, 17:11, 18:9, 20:14, 20:15, 26:1, 53:4, 53:6, 54:19
**June** [7] - 4:8, 15:23, 24:15, 24:16, 29:14, 36:19, 36:22
**JUROR** [1] - 46:20
**jurors** [3] - 51:15, 52:3, 52:22
**jury** [1] - 53:13


## K


**KASULIS** [1] - 1:14
**keep** [5] - 18:18, 19:13, 22:9, 33:6, 53:9
**keeping** [1] - 16:9
**Kelly** [29] - 3:6, 3:11, 4:17, 4:22, 24:7, 26:4, 26:23, 27:15, 27:17, 28:13, 28:15, 29:4, 30:9, 31:4, 31:9, 31:21, 31:23, 32:5, 32:11, 36:25, 38:2, 41:1, 41:10, 45:15, 47:6, 47:9, 48:25, 49:21, 56:6
**KELLY** [1] - 1:6

**Kelly's** [12] - 10:4, 11:7, 13:20, 14:13, 14:23, 15:13, 16:1, 19:14, 20:24, 23:6, 25:5, 54:20
**kind** [4] - 11:3, 24:4, 27:10, 34:25
**kinds** [1] - 39:4
**knowing** [1] - 47:12
**knowledge** [4] - 7:14, 8:13, 11:17, 14:7
**known** [1] - 10:6

## L

**laptops** [2] - 48:17, 48:18
**LaSalle** [1] - 2:7
**last** [7] - 19:2, 19:21, 21:5, 21:11, 22:25, 38:9, 48:23
**law** [2] - 27:21, 55:8
**LAW** [2] - 1:21, 2:1
**lawyer** [33] - 19:22, 20:21, 28:8, 30:17, 30:20, 30:22, 30:23, 32:20, 33:6, 33:14, 33:17, 34:22, 38:25, 39:3, 39:25, 42:22, 42:23, 44:13, 45:8, 45:10, 45:11, 45:12, 45:13, 45:17, 45:18, 46:4, 46:8, 46:11, 46:17, 46:23
**lawyer's** [3] - 31:12, 33:14, 39:5
**LAWYERS** [1] - 2:3
**lawyers** [9] - 4:10, 22:11, 33:20, 34:14, 36:10, 44:11, 46:9, 46:14
**leads** [1] - 35:3
**learn** [1] - 10:23
**learned** [3] - 42:13, 44:12, 48:7
**least** [5] - 23:18, 27:20, 46:9, 46:10, 50:20
**leave** [1] - 12:25
**led** [2] - 9:25, 12:4
**Lee** [2] - 48:5, 48:7
**left** [2] - 3:11, 3:12
**legal** [12] - 11:7, 11:18, 14:13, 21:19, 26:6, 26:8, 27:11, 34:25, 35:22, 36:1, 42:17, 44:13
**lengthy** [2] - 23:2, 23:16
**LEON** [1] - 1:20
**Leonard** [3] - 3:17, 16:7, 47:14
**LEONARD** [3] - 2:6, 2:8, 47:17
**letter** [17] - 3:25, 12:7, 12:10, 21:7, 24:14, 24:15, 24:16, 24:22, 29:11, 29:14, 31:3, 36:19, 36:24, 39:10, 43:17, 48:2, 51:20
**letters** [1] - 24:23
**letting** [1] - 10:24
**likelihood** [1] - 5:7
**limine** [1] - 53:4
**limitations** [2] - 32:6, 33:18
**limited** [6] - 42:6, 42:11, 55:6, 55:23, 56:13, 56:15
**line** [3] - 37:18, 52:22
**lines** [2] - 8:11, 10:5
**list** [9] - 48:7, 51:14, 51:17, 51:21, 51:22, 51:23, 52:1, 52:10, 52:20
**LLP** [2] - 2:6, 2:9
**location** [1] - 18:12
**look** [7] - 15:21, 16:14, 17:10, 26:1, 43:11, 51:23, 53:13
**looking** [1] - 6:13
**lovely** [2] - 8:8, 11:5
**low** [1] - 53:9
**low-drama** [1] - 53:9
**loyalty** [4] - 35:2, 35:22, 35:25, 36:4
**luck** [2] - 14:2, 14:15
**lunch** [1] - 18:8

## M

**ma'am** [10] - 31:25, 34:2, 34:6, 34:20, 35:20, 39:7, 43:18, 44:8, 45:25, 46:5
**Madison** [1] - 1:22
**Magistrate** [1] - 54:21
**mail** [12] - 1:25, 4:25, 8:2, 8:7, 8:16, 10:16, 10:18, 10:20, 10:21, 54:23, 56:1
**maintained** [1] - 10:18
**Maria** [1] - 3:8
**MARIA** [1] - 1:17
**markers** [1] - 48:16
**Marshal's** [1] - 50:16
**Maspeth** [1] - 1:20
**material** [1] - 11:18
**materials** [5] - 4:25, 5:5, 9:14, 17:3, 20:4
**Matter** [1] - 56:18
**matters** [2] - 15:24, 43:15
**MDC** [2] - 48:3, 48:21
**mean** [7] - 14:5, 16:12, 16:23, 30:9, 44:23, 56:2, 56:5
**means** [3] - 16:24, 35:1, 46:21
**mechanics** [1] - 51:1
**media** [5] - 11:13, 20:20, 21:4, 26:7, 27:9
**mediate** [1] - 4:10
**medical** [1] - 49:8
**medication** [1] - 49:3
**meet** [1] - 40:22
**meeting** [5] - 18:11, 23:1, 23:18, 23:20, 55:1
**meetings** [2] - 38:13, 50:13
**MEISTER** [1] - 2:9
**MELENDEZ** [29] - 1:17, 3:8, 5:22, 5:25, 14:22, 15:7, 22:24, 23:13, 23:23, 24:12, 24:16, 25:2, 26:16, 29:20, 29:22, 30:12, 30:21, 31:17, 32:3, 36:19, 36:22, 37:8, 37:13, 37:21, 37:25, 41:3, 47:7, 51:19, 54:4
**Melendez** [4] - 3:9, 24:9, 36:16
**member** [1] - 40:3
**members** [1] - 42:13
**mentioned** [4] - 13:25, 29:23, 30:14, 39:3
**mesh** [2] - 50:14, 50:16
**message** [17] - 8:1, 8:7, 8:18, 9:2, 9:5, 9:9, 9:11, 9:24, 10:1, 17:12, 17:16, 18:4, 18:6, 20:19, 20:23, 21:6, 22:6
**messages** [4] - 9:18, 9:22, 16:14, 17:10
**met** [12] - 4:14, 6:21, 7:5, 7:7, 8:21, 9:1, 10:11, 10:13, 25:4, 25:12, 30:13, 40:5
**metal** [1] - 48:13
**method** [2] - 30:5, 51:1
**MEYER** [1] - 2:6
**MI** [1] - 2:2
**microphone** [1] - 31:22
**might** [14] - 7:22, 23:6, 30:17, 33:6, 35:2, 35:11, 36:3, 36:14, 36:17, 39:10, 42:22, 51:18, 51:20
**Mike** [1] - 3:17
**mind** [5] - 11:15, 15:25, 16:9, 26:6, 48:8
**minute** [1] - 28:20
**minutes** [1] - 8:20
**moment** [3] - 28:16, 40:11, 44:18
**months** [1] - 25:16
**more-detailed** [1] - 30:1
**morning** [1] - 55:4
**most** [2] - 53:20, 56:5
**motions** [1] - 53:4
**motivated** [1] - 33:5
**move** [3] - 32:4, 53:18, 53:21
**MR** [22] - 3:17, 22:20, 22:22, 47:16, 47:17, 49:2, 49:9, 49:14, 49:25, 50:4, 50:7, 50:12, 51:2, 51:6, 51:8, 51:11, 52:2, 52:6, 52:13, 52:19, 54:7, 56:10
**MS** [123] - 3:8, 3:10, 3:15, 3:21, 5:19, 5:22, 5:25, 6:6, 6:9, 6:12, 6:17, 6:21, 6:24, 7:3, 7:8, 7:11, 7:13, 7:16, 7:18, 7:21, 8:1, 8:5, 8:10, 8:18, 9:3, 9:6, 9:10, 9:16, 9:20, 9:23, 10:2, 10:9, 10:13, 10:17, 11:1, 11:3, 11:11, 11:24, 12:3, 12:19, 13:4, 13:19, 14:6, 14:9, 14:22, 15:2, 15:7, 15:12, 15:15, 15:18, 16:11, 16:19, 16:22, 17:1, 17:6, 17:8, 17:21, 17:25, 18:3, 18:15, 18:19, 18:21, 19:20, 19:24, 20:7, 20:23, 21:3, 21:15, 21:22, 22:5, 22:14, 22:24, 23:13, 23:23, 23:25, 24:12, 24:16, 24:18, 24:23, 25:2, 25:9, 25:14, 25:20, 25:24, 26:11, 26:16, 26:19, 26:21, 28:14, 28:21, 29:8, 29:17, 29:19, 29:20, 29:22, 30:12, 30:21, 31:15, 31:17, 32:3, 36:19, 36:22, 37:5, 37:8, 37:12, 37:13, 37:21, 37:23, 37:25, 41:3, 41:6, 44:18, 44:21, 45:15, 47:7, 47:24, 51:19, 54:4, 54:14, 54:18, 55:22, 56:8, 56:14
**multiple** [1] - 48:18
**mutually** [1] - 54:22

## N


**Nadia** [1] - 3:9
**NADIA** [1] - 1:17
**name** [4] - 5:3, 5:21, 30:19, 52:20
**named** [2] - 12:10, 37:17
**names** [2] - 51:21, 52:6
**nature** [4] - 11:18, 21:25, 26:5, 32:21
**neat** [1] - 53:22
**necessarily** [1] - 27:17
**necessary** [1] - 31:2
**need** [15] - 10:4, 15:10, 15:14, 24:20, 26:22, 28:12, 28:16, 41:20, 41:22, 47:1, 47:2, 47:22, 51:18, 52:10, 52:25
**needed** [1] - 21:24
**needs** [3] - 49:6, 52:20, 54:2
**never** [4] - 21:19, 25:18, 26:3, 32:20
**NEW** [1] - 1:1
**new** [2] - 12:9
**New** [5] - 1:6, 1:15, 1:16, 1:22, 2:10
**next** [4] - 20:16, 40:15, 52:5, 52:9
**Nichole** [1] - 3:10
**nobody** [2] - 18:12, 39:20
**NOLAN** [1] - 1:24
**NolanEDNY@aol.com** [1] - 1:25
**nonetheless** [1] - 48:10
**note** [3] - 10:20, 32:3, 37:15
**noted** [2] - 32:5, 51:20
**notes** [2] - 10:17, 48:16
**nothing** [6] - 15:13, 26:10, 41:3, 47:7, 54:4, 54:7
**notice** [1] - 52:17
**nourishment** [1] - 49:6
**number** [6] - 3:5, 11:16, 11:17, 20:14, 36:17, 36:20
**NY** [3] - 1:20, 1:22, 2:10


## O


**o'clock** [1] - 54:1
**Oak** [1] - 2:2
**object** [1] - 45:23
**objected** [1] - 55:2
**objection** [3] - 15:7, 53:17, 53:22
**objections** [1] - 53:16
**objective** [1] - 19:15
**obligation** [1] - 4:4
**obligations** [1] - 32:21
**obtained** [1] - 54:19
**obvious** [1] - 11:4
**obviously** [2] - 16:16, 27:3
**OCR** [1] - 1:24
**OF** [4] - 1:1, 1:3, 1:11, 1:21
**office** [2] - 10:18, 56:1
**OFFICE** [1] - 1:21
**officers** [1] - 55:9
**once** [3] - 40:13, 44:16, 53:24
**one** [30] - 5:2, 5:18, 7:21, 11:16, 13:7, 19:8, 21:23, 25:10, 26:24, 28:1, 29:7, 31:11, 32:3, 32:16, 32:23, 32:24, 34:14, 36:10, 37:7, 37:9, 37:13, 43:3, 43:22, 44:15, 44:18, 52:13, 53:5, 53:7, 55:2
**ooOoo** [1] - 56:21
**open** [3] - 3:1, 5:13, 6:3
**opportunity** [4] - 17:2, 31:18, 31:19, 32:8
**opposition** [1] - 53:5
**option** [1] - 49:19
**order** [8] - 39:1, 48:11, 49:8, 55:7, 55:21, 55:23, 56:12, 56:15
**ordinarily** [1] - 48:20
**organizations** [2] - 51:14, 51:16
**outlet** [1] - 20:20
**outline** [1] - 3:24
**owes** [3] - 35:1, 35:24, 36:4
**own** [4] - 18:23, 19:14, 28:8, 33:19


## P


**p.m** [2] - 1:8, 8:19
**PACER** [1] - 24:24
**page** [10] - 24:17, 36:25, 37:7, 37:9, 37:10, 37:15, 38:2, 38:9
**paper** [1] - 16:15
**paragraph** [13] - 24:17, 24:21, 36:25, 37:4, 37:5, 37:7, 37:8, 37:10, 37:14, 37:15, 38:2, 38:3, 38:8
**paragraphs** [1] - 31:3
**paralegals** [1] - 52:12
**parenthetically** [1] - 3:25
**Park** [1] - 2:10
**part** [5] - 13:15, 20:2, 31:8, 46:13, 52:8
**parte** [4] - 5:11, 12:22, 13:12, 13:15
**particular** [4] - 17:15, 28:13, 36:24, 48:5
**particularly** [1] - 54:25
**parties** [2] - 15:19, 51:4
**passed** [1] - 51:24
**Pause** [3] - 13:2, 27:22, 50:6
**pause** [1] - 50:24
**paused** [1] - 54:13
**paying** [1] - 43:11
**PC** [1] - 2:1
**pen** [1] - 50:16
**pencils** [1] - 48:15
**pens** [2] - 48:14, 48:15
**people** [7] - 9:17, 19:23, 35:22, 36:3, 51:14, 52:10, 53:1
**People** [1] - 18:11
**perceived** [3] - 23:8, 23:9, 26:9
**perfect** [1] - 44:25
**perfectly** [1] - 32:9
**perhaps** [2] - 31:18, 42:17
**period** [2] - 21:14, 41:7
**permit** [1] - 53:16
**person** [19] - 6:21, 8:2, 8:17, 8:21, 9:1, 9:5, 10:11, 10:14, 27:15, 27:19, 28:1, 33:5, 35:1, 38:20, 38:22, 42:21, 43:25, 45:10
**personal** [2] - 19:14, 22:11
**personally** [1] - 26:12
**perspective** [1] - 27:20
**pertain** [1] - 7:22
**pertaining** [1] - 17:3
**Peter** [1] - 48:5
**phase** [1] - 40:15
**phone** [12] - 3:18, 8:5, 8:6, 8:19, 9:8, 9:15, 9:19, 10:2, 10:9, 13:22, 25:16, 47:15
**picture** [1] - 22:15
**piece** [1] - 16:15
**place** [4] - 4:3, 19:16, 26:24, 50:19
**places** [1] - 51:14
**plaintiff** [1] - 1:4
**plausible** [1] - 28:6
**Plaza** [1] - 1:16
**pleasant** [1] - 8:23
**pleasure** [1] - 53:7
**plus** [1] - 49:14
**point** [11] - 4:13, 7:5, 10:23, 11:4, 12:21, 16:12, 21:23, 24:12, 24:21, 31:3, 47:13
**pointed** [1] - 29:23
**points** [1] - 48:2
**policy** [1] - 48:21
**portion** [1] - 42:10
**portions** [1] - 5:9
**pose** [1] - 43:21
**poses** [1] - 28:3
**position** [6] - 21:1, 23:9, 23:14, 33:24, 41:16, 44:14
**positive** [1] - 55:14
**possibility** [1] - 39:24
**possible** [6] - 5:1, 30:8, 30:12, 31:11, 39:20, 51:19
**potential** [17] - 4:22, 29:5, 29:24, 32:11, 32:16, 32:18, 34:18, 35:1, 37:17, 40:5, 41:23, 41:25, 42:19, 43:20, 44:23, 46:24, 47:12
**pre** [1] - 49:4
**pre-diabetic** [1] - 49:4
**preceding** [1] - 38:9
**precisely** [1] - 45:15
**predict** [1] - 39:20
**prepared** [1] - 40:16
**presence** [1] - 44:11
**present** [3] - 3:3, 3:21, 23:23
**presiding** [1] - 3:2
**pressure** [1] - 40:11
**pressures** [1] - 28:8
**pretrial** [2] - 51:4, 53:25
**pretty** [3] - 44:5, 44:7, 52:2
**prevented** [1] - 35:2
**preview** [1] - 53:6
**privilege** [6] - 5:8, 5:16, 12:23, 13:6, 13:9, 27:4

**privileged** [8] - 6:5, 11:22, 12:1, 12:18, 12:20, 35:6, 35:10, 35:18
**problem** [3] - 48:6, 51:9, 52:23
**procedure** [2] - 55:11, 55:14
**proceeding** [4] - 4:1, 4:6, 48:3, 50:1
**proceedings** [4] - 13:2, 27:22, 50:6, 50:24
**Proceedings** [1] - 54:13
**produced** [2] - 20:18, 49:20
**prohibited** [1] - 35:16
**pronounce** [1] - 42:3
**proper** [1] - 55:11
**propose** [1] - 55:22
**proposed** [1] - 54:24
**PROSPECTIVE** [1] - 46:20
**protect** [1] - 39:1
**protected** [1] - 27:4
**provide** [1] - 55:7
**provided** [3] - 17:2, 42:17, 55:2
**providing** [1] - 55:24
**public** [1] - 27:9
**publicly** [1] - 26:10
**pull** [1] - 32:1
**purpose** [1] - 30:1
**purposes** [6] - 5:25, 23:6, 23:14, 30:5, 55:24, 56:15
**pursuant** [1] - 4:4
**put** [13] - 10:17, 12:16, 14:19, 14:20, 14:24, 14:25, 15:14, 22:9, 22:14, 41:1, 44:13, 47:6, 54:2
**putting** [2] - 22:9, 44:12

## Q

**questioning** [2] - 39:4, 42:6
**questionnaire** [1] - 51:15
**questionnaires** [1] - 52:4
**questions** [17] - 5:5, 5:7, 6:3, 14:17, 14:19, 14:24, 15:4, 19:5, 23:4, 27:12, 33:7, 33:22, 34:1, 39:15, 40:23, 47:5, 48:6
**quick** [1] - 3:24
**quietly** [1] - 32:8
**quite** [3] - 12:16, 30:10, 48:23
**quote** [2] - 4:5, 14:1

## R

**raise** [1] - 23:14
**raised** [4] - 29:11, 29:13, 34:23, 40:6
**read** [2] - 18:17, 21:8
**reading** [2] - 18:18, 32:6
**ready** [3] - 44:21, 52:15, 56:7
**really** [6] - 19:3, 19:6, 24:20, 40:16, 40:21, 45:12
**reason** [4] - 18:18, 20:9, 43:20, 45:17
**reasonable** [2] - 27:15, 27:18
**reasons** [2] - 35:13, 48:20
**receive** [1] - 9:1
**received** [10] - 4:24, 9:5, 9:14, 9:24, 12:7, 24:22, 24:23, 35:6, 48:2, 53:5
**receiving** [1] - 12:5
**reception** [1] - 50:15
**Recess** [2] - 28:22, 41:9
**recess** [6] - 12:22, 12:25, 28:20, 40:12, 40:24, 41:7
**recollection** [5] - 15:24, 16:23, 16:24, 25:3, 25:7
**record** [16] - 10:19, 14:20, 16:13, 18:19, 18:20, 19:25, 20:2, 21:11, 22:9, 22:10, 26:25, 27:19, 30:3, 30:7, 47:8, 54:2
**Redwelds** [1] - 48:13
**refer** [3] - 17:24, 36:15, 43:15
**reference** [2] - 31:2, 43:16
**references** [1] - 32:7
**referred** [2] - 5:4, 5:24
**referring** [4] - 5:3, 5:18, 5:20, 26:10
**refresh** [1] - 15:23
**refuse** [1] - 55:10
**refute** [2] - 28:9
**regard** [3] - 4:21, 47:21, 48:14
**regarding** [8] - 5:5, 7:10, 8:11, 13:17, 14:5, 14:24, 48:2, 56:11
**regardless** [2] - 31:14, 35:23
**regularly** [1] - 14:10
**rein** [5] - 14:1, 14:4, 14:5, 14:6, 14:14
**relate** [2] - 4:11, 6:4
**related** [8] - 27:5, 28:11, 29:7, 32:25, 36:7, 44:4, 44:9, 44:15
**relatedly** [1] - 37:3
**relates** [1] - 37:6
**relating** [1] - 5:1
**relationship** [12] - 5:10, 12:4, 12:7, 22:3, 23:4, 23:5, 24:4, 27:23, 32:19, 34:24, 35:23, 35:24
**relay** [1] - 27:3
**relaying** [2] - 11:6, 11:17
**relevant** [1] - 12:18
**rely** [1] - 35:5
**remember** [5] - 10:2, 10:19, 11:13, 13:23, 24:5
**remind** [3] - 4:9, 5:2, 51:3
**repeat** [2] - 16:6, 45:1
**reply** [1] - 11:14
**REPORTER** [1] - 1:24
**represent** [6] - 6:16, 18:22, 18:24, 32:15, 45:23, 46:18
**representation** [7] - 4:17, 5:8, 7:2, 19:12, 26:4, 42:16, 47:18
**represented** [14] - 6:17, 18:14, 19:2, 19:23, 20:6, 20:11, 24:3, 25:21, 28:3, 33:17, 34:8, 34:22, 43:9, 46:8
**representing** [7] - 7:6, 12:14, 19:18, 21:2, 25:16, 28:1, 32:12
**represents** [1] - 27:14
**request** [2] - 53:14, 55:16
**require** [2] - 11:21, 28:4
**requires** [1] - 49:22
**research** [1] - 17:9
**resolve** [1] - 54:15
**respect** [8] - 14:6, 20:8, 26:16, 29:25, 30:4, 37:14, 37:19, 47:20
**respected** [2] - 40:3, 47:11
**respond** [2] - 20:15, 22:1
**responded** [2] - 20:13, 21:24
**response** [4] - 9:1, 11:18, 14:1, 18:11
**restrictions** [2] - 48:9, 49:23
**result** [1] - 20:19
**resume** [1] - 41:8
**retained** [5] - 6:7, 6:9, 10:3, 32:20
**review** [3] - 17:3, 20:4, 33:11
**reviewed** [5] - 4:7, 32:10, 37:11, 38:3, 38:12
**rights** [1] - 40:19
**risk** [3] - 43:24, 45:7, 45:8
**risks** [2] - 34:21, 41:24
**Robert** [1] - 3:5
**ROBERT** [1] - 1:6
**Rodriguez** [23] - 3:20, 4:14, 4:25, 5:5, 5:12, 5:14, 5:17, 6:2, 13:3, 13:5, 15:4, 15:16, 16:16, 17:4, 17:14, 18:23, 19:18, 21:19, 22:3, 25:22, 27:1, 27:5, 27:8
**RODRIGUEZ** [40] - 3:21, 5:19, 6:6, 6:9, 6:12, 6:17, 6:21, 6:24, 7:3, 7:8, 7:11, 7:13, 7:16, 7:18, 7:21, 8:1, 8:5, 8:10, 8:18, 9:3, 9:6, 9:10, 9:16, 9:20, 9:23, 10:2, 10:9, 10:13, 10:17, 11:1, 11:3, 11:11, 11:24, 12:3, 12:19, 13:4, 13:19, 14:6, 14:9, 15:18
**Rodriguez's** [2] - 27:6, 27:20
**role** [1] - 40:4
**roles** [1] - 8:11
**room** [2] - 48:19, 49:5
**Royal** [1] - 2:2
**RPR** [1] - 1:24
**rule** [1] - 19:22
**rumor** [1] - 44:1
**rumors** [1] - 43:23
**running** [1] - 49:15

## S

**satisfied** [1] - 34:10
**Savage** [9] - 5:21, 6:8, 7:7, 11:4, 23:23, 25:4, 35:5, 35:19, 42:2
**saved** [1] - 9:10
**saw** [2] - 8:21, 10:17
**Schmidt** [1] - 18:7
**Scholar** [1] - 52:16
**screen** [2] - 50:14, 50:16
**seal** [1] - 55:6
**sealed** [1] - 30:2
**search** [1] - 54:19
**seated** [2] - 3:11
**second** [9] - 7:21, 36:24, 37:6, 37:8,

37:14, 38:2, 43:3, 48:6, 50:4
**secret** [1] - 18:12
**security** [2] - 48:20, 50:19
**see** [4] - 24:20, 29:10, 50:9, 55:18
**seeing** [2] - 16:23, 16:24
**seek** [1] - 38:20
**seeking** [1] - 12:8
**SEELIG** [1] - 2:9
**send** [5] - 9:4, 9:17, 12:11, 27:24, 56:14
**sending** [2] - 10:19, 21:7
**sense** [1] - 56:5
**sent** [10] - 8:6, 8:18, 9:2, 9:21, 10:16, 10:20, 16:15, 16:20, 17:12, 20:17
**sentence** [1] - 18:16
**separate** [3] - 38:11, 42:18, 51:22
**separately** [1] - 53:2
**September** [1] - 6:18
**series** [1] - 33:22
**serious** [1] - 39:22
**services** [1] - 34:10
**set** [1] - 55:8
**several** [1] - 21:25
**severed** [1] - 12:7
**shall** [1] - 56:13
**share** [3] - 22:3, 35:12, 42:12
**Shihata** [1] - 3:9
**SHIHATA** [6] - 1:17, 54:14, 54:18, 55:22, 56:8, 56:14
**shot** [1] - 44:17
**show** [5] - 16:16, 17:11, 31:4, 50:15, 55:10
**showed** [2] - 43:16, 49:10
**side** [4] - 14:23, 15:13, 54:2, 56:9
**sidebar** [3] - 30:4, 53:11, 53:15
**sign** [1] - 56:13
**signed** [2] - 12:8, 54:20
**significant** [3] - 21:13, 21:15, 21:18
**similar** [1] - 28:14
**simply** [3] - 17:11, 20:9, 22:14
**sitting** [1] - 30:10
**situation** [3] - 27:25, 33:19, 38:25
**slowly** [1] - 7:19
**smoothly** [1] - 32:4
**social** [1] - 20:20
**solution** [1] - 48:6
**someone** [2] - 19:17, 38:18
**sometimes** [3] - 9:17, 53:17
**somewhat** [2] - 21:18, 29:6
**soon** [1] - 55:25
**SOPHIE** [1] - 1:24
**sorry** [12] - 6:12, 7:17, 7:18, 8:14, 11:10, 17:6, 17:21, 18:25, 25:14, 37:5, 43:6, 54:14
**sort** [3] - 28:4, 28:11, 53:8
**sound** [2] - 18:25, 31:16
**sounds** [2] - 11:20, 44:25
**speaking** [5] - 13:11, 14:10, 33:4, 46:1, 53:16
**specific** [3] - 15:3, 16:9, 37:11
**specifically** [9] - 8:10, 9:25, 11:12, 17:3, 18:5, 24:5, 38:1, 40:17, 43:15
**specifics** [3] - 11:20, 24:6, 27:3
**spectre** [1] - 4:5
**spend** [1] - 47:23
**spent** [1] - 29:12
**spoken** [1] - 13:21
**spokesperson** [3] - 17:13, 18:7
**start** [4] - 14:18, 41:19, 48:11, 54:2
**started** [1] - 21:9
**starting** [1] - 37:17
**state** [1] - 3:7
**STATES** [3] - 1:1, 1:3, 1:12
**States** [3] - 1:5, 1:15, 1:18
**Ste** [1] - 2:7
**step** [1] - 10:5
**steps** [1] - 43:25
**Steve** [1] - 3:17
**sticking** [1] - 48:2
**sticky** [1] - 48:15
**still** [6] - 9:11, 9:14, 11:6, 12:5, 21:3, 46:4
**stop** [2] - 14:11, 17:20
**strike** [1] - 20:10
**stuff** [2] - 21:4, 21:19
**subjects** [1] - 6:4
**submissions** [6] - 4:7, 4:24, 12:16, 29:6, 29:24, 40:7
**submitted** [5] - 4:8, 5:6, 18:17, 51:14, 51:17
**substantial** [1] - 32:18
**subtle** [1] - 45:8
**suffice** [1] - 49:17
**sufficient** [2] - 30:15, 31:16
**sufficiently** [1] - 29:9
**suggestion** [1] - 48:24
**suit** [1] - 21:24
**Suite** [1] - 2:4
**supplied** [3] - 17:11, 20:12, 25:25
**suspenders** [1] - 31:8
**sustained** [1] - 34:17
**swabbing** [1] - 55:9
**SYLVESTER** [1] - 1:6
**symptoms** [1] - 49:10


## T


**table** [1] - 30:10
**team** [3] - 14:13, 42:14, 52:8
**technically** [1] - 37:15
**technology** [1] - 9:6
**teleconference** [2] - 2:5, 2:8
**terminate** [1] - 22:7
**termination** [1] - 21:7
**terms** [5] - 41:24, 42:10, 43:19, 49:7, 50:20
**testifies** [1] - 45:9
**testify** [1] - 39:12
**testimony** [2] - 25:7, 35:4
**text** [22] - 8:1, 8:7, 8:14, 8:16, 8:18, 9:1, 9:5, 9:11, 9:17, 9:22, 9:24, 10:1, 10:10, 17:10, 17:12, 17:16, 18:4, 18:6, 20:12, 20:19, 20:23, 21:6
**texted** [1] - 20:15
**texts** [2] - 20:13, 20:14
**THE** [228] - 1:12, 1:21, 3:4, 3:14, 3:16, 3:19, 3:23, 5:20, 5:23, 6:2, 6:7, 6:11, 6:15, 6:19, 6:23, 7:1, 7:5, 7:9, 7:12, 7:15, 7:17, 7:20, 7:24, 8:3, 8:9, 8:14, 8:25, 9:4, 9:8, 9:13, 9:17, 9:21, 9:25, 10:8, 10:11, 10:15, 10:22, 11:2, 11:10, 11:19, 11:25, 12:15, 12:21, 13:3, 13:5, 14:4, 14:8, 14:16, 14:23, 15:5, 15:9, 15:13, 15:16, 15:19, 16:18, 16:20, 16:25, 17:5, 17:7, 17:20, 17:22, 18:2, 18:13, 18:17, 18:20, 18:25, 19:21, 20:1, 20:22, 21:1, 21:10, 21:20, 22:2, 22:8, 22:17, 22:21, 22:23, 23:10, 23:20, 24:8, 24:15, 24:20, 24:25, 25:3, 25:12, 25:18, 25:21, 26:3, 26:14, 26:18, 26:20, 26:22, 27:23, 28:17, 28:23, 29:10, 29:15, 29:18, 29:21, 30:9, 30:13, 30:22, 31:16, 31:20, 31:25, 32:1, 32:2, 32:10, 34:2, 34:3, 34:6, 34:7, 34:9, 34:10, 34:12, 34:13, 34:15, 34:16, 34:20, 34:21, 35:8, 35:9, 35:15, 35:16, 35:20, 35:21, 36:6, 36:7, 36:12, 36:13, 36:21, 36:23, 37:3, 37:11, 37:20, 37:22, 38:1, 38:4, 38:5, 38:7, 38:8, 38:14, 38:15, 39:7, 39:8, 39:14, 39:15, 39:17, 39:18, 40:1, 40:2, 41:5, 41:7, 41:10, 41:14, 41:15, 41:18, 41:19, 42:1, 42:7, 42:9, 42:10, 42:15, 42:16, 42:25, 43:1, 43:3, 43:4, 43:6, 43:7, 43:8, 43:14, 43:18, 43:19, 43:22, 43:24, 44:3, 44:4, 44:8, 44:9, 44:19, 44:22, 44:24, 45:2, 45:6, 45:7, 45:17, 45:20, 45:21, 45:25, 46:1, 46:5, 46:6, 46:13, 46:14, 46:21, 46:25, 47:1, 47:4, 47:5, 47:8, 47:18, 47:25, 49:3, 49:13, 49:19, 50:1, 50:5, 50:8, 50:18, 50:25, 51:3, 51:7, 51:9, 51:12, 51:22, 52:3, 52:9, 52:17, 52:21, 54:6, 54:8, 54:17, 55:13, 56:2, 56:9, 56:13, 56:16
**therefore** [1] - 20:11
**third** [3] - 44:14, 46:11, 49:19
**THOMAS** [1] - 1:21
**thoughts** [2] - 16:13, 22:4
**three** [6] - 8:17, 24:17, 36:9, 37:15, 37:18, 49:20
**thumb** [1] - 50:20
**Thursday** [1] - 1:7
**today** [4] - 3:25, 29:7, 34:5, 38:12
**today's** [2] - 4:1, 4:6
**toes** [1] - 10:5
**Tom** [1] - 3:12
**took** [2] - 14:12, 49:14
**top** [1] - 37:9

**topic** [1] - 22:18
**topics** [1] - 12:23
**totally** [1] - 44:25
**towards** [2] - 13:24, 32:1
**TRANSCRIPT** [1] - 1:11
**trial** [6] - 23:9, 23:14, 39:12, 43:12, 45:10, 46:22
**TRIAL** [1] - 2:3
**true** [5] - 21:14, 30:23, 31:10, 31:14, 43:25
**trust** [1] - 32:19
**try** [1] - 43:10
**trying** [7] - 7:19, 19:7, 19:25, 22:9, 22:14, 49:17, 53:8
**turn** [1] - 12:8
**turned** [1] - 25:16
**two** [19] - 5:1, 5:9, 7:2, 11:17, 18:1, 18:14, 19:19, 20:6, 27:12, 33:20, 35:10, 36:25, 37:10, 37:15, 38:2, 46:9, 46:14, 52:6

**U**

**ultimately** [1] - 20:16
**umbrella** [1] - 26:8
**unbiased** [1] - 39:11
**unconsciously** [1] - 36:2
**under** [3] - 26:8, 40:10, 55:6
**understood** [1] - 8:23
**unethical** [3] - 38:16, 38:18, 38:20
**unfortunately** [1] - 16:22
**unheeded** [1] - 14:11
**UNITED** [3] - 1:1, 1:3, 1:12
**United** [3] - 1:5, 1:15, 1:18
**unless** [4] - 16:4, 22:12, 47:23, 55:10
**unnecessary** [1] - 53:12
**unsealing** [5] - 55:7, 55:21, 55:23, 56:12, 56:15
**unsworn** [5] - 36:8, 37:6, 37:19, 37:23, 44:14
**untrue** [1] - 31:10
**up** [13] - 20:9, 21:5, 21:6, 28:12, 29:7, 39:19, 39:21, 39:22, 43:10, 46:7, 46:11, 46:18, 49:22
**updated** [1] - 51:18
**upset** [1] - 52:14
**upstairs** [2] - 49:12, 49:15
**USA** [1] - 3:5
**useful** [1] - 23:6

**V**

**vaccinated** [2] - 31:24, 52:11
**various** [1] - 8:4
**versus** [1] - 3:5
**via** [2] - 2:5, 30:4
**Via** [1] - 2:8
**view** [1] - 29:15
**violating** [1] - 28:7
**violation** [4] - 28:9, 33:1, 33:2, 33:3
**violations** [1] - 42:20
**virtual** [1] - 3:22
**visiting** [2] - 48:19, 49:5

**W**

**waive** [5] - 4:18, 32:13, 33:25, 41:16, 42:5
**waiver** [2] - 47:11, 47:13
**waiving** [1] - 29:18
**walked** [1] - 30:11
**wants** [5] - 5:15, 19:4, 41:1, 47:6, 47:23
**warrant** [8] - 54:19, 54:21, 55:2, 55:3, 55:15, 55:16, 56:4
**Washington** [1] - 2:1
**waste** [1] - 19:10
**watching** [1] - 28:18
**week** [2] - 49:20, 52:5
**weeks** [1] - 13:20
**West** [1] - 2:4
**whatsoever** [1] - 25:23
**whichever** [1] - 51:9
**whole** [1] - 28:24
**willing** [1] - 33:25
**win** [1] - 53:17
**witness** [28] - 5:2, 5:11, 5:21, 13:7, 13:10, 13:12, 13:14, 14:17, 14:19, 14:20, 14:24, 15:6, 15:14, 35:1, 35:5, 35:17, 36:8, 36:11, 37:6, 37:19, 37:24, 39:4, 44:14, 45:9, 45:12, 45:18
**witness's** [1] - 35:3
**witnesses** [17] - 5:1, 5:9, 7:10, 18:14, 23:12, 23:17, 28:2, 32:18, 33:7, 34:18, 35:10, 36:9, 37:17, 44:10, 44:12, 52:7
**woman** [1] - 18:4
**women** [12] - 7:2, 10:24, 17:5, 17:7, 17:8, 17:23, 18:2, 18:22, 19:19, 20:6, 20:17
**words** [1] - 16:5
**wrongdoing** [1] - 39:9

**Y**

**years** [1] - 18:1
**yesterday** [1] - 54:23
**YORK** [1] - 1:1
**York** [5] - 1:6, 1:15, 1:16, 1:22, 2:10

**Z**

**zero** [2] - 16:22, 16:24